(849 P.2d 977)

No. 67,713

IN THE MATTER OF THE ESTATE
OF MARY R. KOCH, Deceased.

Opinion filed April 2, 1993.

*Monte Vines* and *Clifford L. Malone*, of Adams, Jones, Robinson, and Malone, Chartered, of Wichita, for appellants Frederick Koch and William Koch.

*Richard C. Hite* and *Linda S. Parks*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, for appellee Robert L. Howard.

*James M. Armstrong* and *Carol A. Beier*, of Foulston, Seifkin, of Wichita, for appellee Charles G. Koch, executor.

Before LARSON, P.J., LEWIS, J., and BARRY A. BENNINGTON, District Judge, assigned.

LARSON, J.: This is a will contest in which the contestants claim an anti-litigation clause is void and unenforceable.

Frederick Koch and William Koch contend this provision in their mother's will is void under K.S.A. 59-605; void as contrary to public policy; and, because the scrivener of the will was in a conflict of interest position, void as a product of undue influence and constructive fraud. Contestants further assert the trial court erred by ruling a memorandum disposing of personal property, supplemental to the will, was subject to the provisions of the forfeiture clause.

To understand the holding herein, it is necessary to recite a detailed factual background, which was determined by the trial court after extensive hearings.

## FACTUAL BACKGROUND

Mary R. Koch died at age 83 on December 21, 1990, leaving an estate of approximately $10,000,000. She was the widow of Fred C. Koch, who died in 1967. Mary and Fred Koch were the parents of four sons, Frederick, Charles, and twins David and William, all of whom survive. Charles and David are the proponents of the will at issue herein. William and Frederick are the contestants.

Fred C. Koch was the founder of companies now consolidated and known as Koch Industries, Inc. In 1966, he transferred substantial amounts of his Koch Industries stock in equal shares to four trusts, of which his sons were the beneficiaries. Frederick's behavior became unacceptable to his father and later transfers only benefited the other three sons. Frederick was not a beneficiary of his father's estate.

Charles was employed by Koch Industries and became its chairman and chief executive officer upon his father's death. He continues to serve in this capacity.

David and William were officers and employees of Koch Industries after their father's death. David continues in this capacity. William was terminated as an officer and employee in 1980 following a failed hostile attempt to take control of Koch Industries. Frederick supported William in this abortive action.

Charles, David, and William each owned approximately 20 percent of Koch Industries stock. Frederick has never been employed by Koch Industries and beneficially owned approximately 1,600,000 shares of stock.

During the period between 1967 and 1980, Koch Industries grew rapidly and prospered extensively. It is now a diversified company with petroleum, hydrocarbon, chemical, chemical technology, agricultural, and mineral business groups. As a private company, Koch Industries' specific data about its finances is proprietary and confidential, but it is one of the largest purchasers of crude oil in the United States and has approximately 11,000 employees. An indication of the company's success can be derived from the dividends it paid. In 1967, dividends on Koch Industries stock were less than three cents per share. By 1980, the dividends had increased to $1.50 per share.

Frederick's annual income from dividends was approximately $4,500,000 in 1983 when he sold his stock in Koch Industries back to the company for $300,000,000. William's income grew and was larger than Frederick's because of his higher percentage of stock ownership until June 1983, when he sold his Koch Industries stock back to the company for $470,000,000.

Fred C. Koch also established the Fred C. Koch Foundation (Foundation). The Foundation is a Kansas non-profit stock cor-

poration. After the death of Fred C. Koch, the stock was owned by Mary Koch and their four sons.

During the period 1982 to 1988, numerous lawsuits were filed among the members of the Koch family. William and Frederick have instituted several suits in which Charles and David, and in two instances Mary, were named as defendants. In one instance, Charles and David initiated litigation against William. These suits are summarized as follows:

(1) In 1982, William, joined by other stockholders of Koch Industries, filed Case 82-1868 in the United States District Court for the District of Kansas. This was a shareholder derivative action alleging mismanagement of Koch Industries. Charles, David, Koch Industries, and others were defendants. This suit was dismissed after the parties entered into a Stock Purchase and Sale Agreement in June 1983. Under the terms of this settlement, Koch Industries purchased the stock owned by the plaintiffs and others who supported them, including Frederick.

(2) In 1985, Case 85-1636-C was filed in the United States District Court for the District of Kansas. William, Frederick, and others are plaintiffs. Charles, David, Koch Industries, and others are defendants.

Plaintiffs allege they did not receive a fair price for their stock from Koch Industries in 1983 because of hidden valuations, hidden assets, and numerous improper actions by defendants. Some of the original claims have been dismissed and others have been added. Defendants have adamantly defended this suit and claim no liability exists. Damages are claimed to be huge by plaintiffs and none by defendants. This case continues to be hotly contested and is pending as of this date.

(3) In 1987, Frederick, William, and others filed Case 87-2436-S in the United States District Court for the District of Kansas against Charles, David, Koch Industries, and others. This suit alleged claims that had been disallowed in the 1985 case and was dismissed by order of Judge Saffels. The dismissal was affirmed by the Tenth Circuit Court of Appeals in an unpublished opinion filed January 5, 1990.

(4) In 1987, Case 87-C-3006, was filed in the District Court of Sedgwick County, Kansas. William was the sole plaintiff. Charles, David, Mary, the Foundation, and others were defendants. This is referred to as the first Foundation case. The case was dismissed because it was improperly filed as a declaratory judgment action.

(5) In 1988, Case 88-C-1782, the second Foundation case, was filed in the District Court of Sedgwick County, Kansas. Both William and Frederick were plaintiffs. Charles, David, Mary, the Foundation, and others were defendants. William and Frederick alleged that Charles, David, and Mary breached an oral agreement among the shareholders of the Foundation, under which each of the shareholders would be permitted to designate charitable gifts in proportion to their percentages of stock ownership. The second Foundation case was tried in April and May of 1989. The trial court found the alleged agreement did not exist and entered judgment for the defendants. This order was affirmed by the Kansas Court of Appeals in an unpublished opinion dated April 20, 1990.

(6) In one instance, Charles and David initiated litigation against William. In 1983, at the time the stock purchase and sale agreement relating to Koch Industries stock was executed, Charles, David, and William entered into a separate agreement covering a gold coin collection and real property located at Thirteenth Street and Rock Road in Wichita, in which each of the three brothers owned a fractional interest. The agreement required the brothers to appoint appraisers to establish the values of the coin collection and the real property. William agreed to buy Charles' and David's interests in the coin collection at the appraised value. Charles and David agreed to buy William's interest in the real property at the appraised value. In May 1988, Charles and David filed Case 88-1320-K in the United States District Court for the District of Kansas, seeking specific performance of the agreement.

William filed a counterclaim making the same allegations that had been made in the 1985 and 1987 cases. The counterclaim was dismissed on July 18, 1989, and judgment was entered against William, compelling performance of the appraisal agreement. This

order was affirmed in *Koch v. Koch*, 903 F.2d 1333 (10th Cir. 1990).

The Wichita law firm of Foulston & Siefkin has represented Koch Industries since the mid-1970's and has represented Charles, David, Mary, and the Foundation in the litigation set forth above. Robert L. Howard, a Foulston & Siefkin partner, has been principally responsible for this representation. Between 1985 and 1989, approximately half of his time was so spent.

Throughout her life, Mary professed love for all of her sons. There is overwhelming evidence, however, consisting of many letters written by Mary and testimony by her relatives, friends, and doctors who examined and treated her, that she was appalled and distressed for a period of 10 years prior to her death by the disputes and lawsuits involving her sons and by the resulting publicity. Numerous articles had appeared during the 1980's in the Wichita Eagle-Beacon newspaper. Articles about the Koch family "feud" have also appeared in national publications, including Fortune Magazine and the Wall Street Journal.

On May 9, 1981, Mary wrote Frederick: "All I want these last years of my life are peace and harmony in my family and I hope and pray that you will help me to mend bridges not destroy them." Mary expressed identical thoughts in numerous other letters written to Frederick and William and in many conversations with relatives and friends during the last years of her life.

Mary executed wills in 1968, 1971, and 1979. These wills were drafted by attorneys on the legal staff of Koch Industries. In each of Mary's prior wills, she consistently followed a relatively simple estate plan. She made bequests of specific personal property to designated relatives and godchildren. She made a specific monetary bequest to the Wichita Art Association, in which she had a longstanding interest. She directed that the residue of her estate be divided equally among her four sons, with the share for Frederick to be held in trust. She designated Charles as her first choice for executor of these wills.

On January 12, 1989, Mary called Howard, who was then representing her in the Foundation case, and asked him to revise her will. Howard had not participated in the drafting of the prior wills, nor had he previously provided any estate planning services

to Mary. A conference was held the following day during which Mary gave Howard information about her prior wills and instructions for eight specific provisions to be included in her revised will.

After discussing the eight specific provisions, Mary told Howard that, as to the rest of her estate, she loved all of her sons and wanted to treat them equally, but she disapproved of the litigation among members of her family and stated she did not want to leave anything to any son bringing litigation because this had been tearing the family apart and causing distress and turmoil in her life. She requested assistance in carrying out this desire in her will. Howard told Mary that he would attempt to draft a clause reflecting her wishes.

Richard C. Harris is a partner at Foulston & Siefkin in charge of the estate planning and probate department. Howard conferred with Harris about revising Mary's will. Following her instructions, Harris prepared the first draft of a revised will. The draft incorporated the specific provisions for which Mary had given instructions. It also contained the following provision, referred to as an anti-litigation or forfeiture clause:

"ITEM TEN: In the event any of my said sons is involved in litigation at the time of my death as a plaintiff against me or any of my other sons, unless such litigation is dismissed by such plaintiff son within six weeks of the date of my death, or if any legatee, devisee, or beneficiary hereunder directly or indirectly contests this will or attempts in any manner to prevent its probate or to set it aside or to alter any of the provisions thereof or to impede, interfere with or otherwise contest the orderly administration of my estate by my herein named executor as herein provided, then, and in any such event, I hereby revoke all legacies, bequests, and devises in favor of such legatee, devisee, or beneficiary, and direct that the share that such beneficiary would otherwise receive hereunder shall become a part of my residuary estate and be disposed of in accordance with ITEM NINE hereof, but with such person having no right to participate therein and to be excluded from any interest in my residuary estate."

Although the numbering of this provision was changed in subsequent drafts of the revised will, the contents of the provision remained the same. The provision became Item Nine of the will executed by Mary on August 11, 1989.

After some delay, occasioned primarily by Mary's physical health problems and the trial of the Foundation case, Howard

delivered the first draft of the revised will to Mary during the latter part of May 1989. There was no discussion of the will at that time and it was left with her for review.

On June 28, 1989, Howard again conferred with Mary at her home. Each provision in the draft of the revised will was discussed. Mary told Howard that she was pleased with Item Ten of the draft (Item Nine of the executed will) and that it "captured what she wanted to do." Other discussions related to specific bequests contained in the will and bequests that she wanted to be added to the will.

After this meeting, Howard again conferred with Harris, who prepared an additional draft incorporating Mary's further wishes regarding special bequests and dispositions of personal property. A copy of this draft was delivered to Mary sometime between July 28 and August 8, 1989.

On August 8 and 9, 1989, Howard had further conferences with Mary at her home to discuss the latest draft of her revised will. The entire will was reviewed, including the provision that became Item Nine of the final draft of the will.

Following this conference, Harris made final revisions to Mary's will and the memorandum providing for disposition of certain personal property.

On August 11, 1989, at approximately 5:00 p.m., Howard took the final draft of Mary's will to her home for execution. Mary met him at the door with the Wall Street Journal published on August 9, 1989, in her hand. She was very upset by an article which referred to the Koch family "feud" and began with derogatory remarks about Charles attributed to William. At first, Mary stated that she might want to change her will to disinherit William and Frederick unconditionally. After a consultation with Howard, she decided to proceed with the execution of the revised will as drafted, including Item Nine.

Mary executed her revised will and a memorandum making disposition of personal property in the presence of Howard; Juanita Cornelson, a longtime legal secretary employed by Foulston & Siefkin; Thomasine Fox, a legal assistant employed by Foulston & Siefkin; and Michael Carlisle, a Bank IV trust officer. Prior to the execution of the will and memorandum, Howard spent at least 30 minutes reviewing the provisions of the will with Mary

in the presence of the witnesses. Mary acknowledged that she understood and approved each provision of the will. She made specific comments about Item Nine, confirming that she understood its provisions. The will was properly signed by Mary and the three subscribing witnesses.

After Mary's death, the will was offered for probate. The 1985 litigation was not dismissed within six weeks of Mary's death and remains pending. Frederick and William filed written defenses to the petition for the will, contending Mary had diminished mental capacity at the time the will was executed; she was not able to understand Item Nine; the will was a product of undue influence; Item Nine was the result of constructive fraud; the will violated K.S.A. 59-605 because it was prepared by the principal beneficiary and Mary did not have independent advice; and Item Nine was void as against public policy.

A trial was held before the court in December 1991. Numerous witnesses testified on behalf of the contestants and proponents. All of Mary's sons except William testified at the trial. Several depositions, including that of Michael Oliver, Mary's companion and close friend since 1984, were admitted into evidence. Correspondence between Mary and her sons and other documents were also admitted as evidence.

In an order filed January 10, 1992, the trial court admitted the will to probate and appointed Charles as executor. All of Frederick's and William's contentions were rejected. The trial court determined the provisions of Item Four of the will relating to the disposition of specific items of personal property were subject to the provisions of Item Nine. Frederick and William appeal.

We will first consider the contentions that the will is void under K.S.A. 59-605 and as a matter of public policy. We will then examine the contestants' claim that an impermissible conflict of interest voids the will and conclude by considering the will construction argument.

*Is Item Nine or the entire will void under K.S.A. 59-605?*

K.S.A. 59-605 states:

"**Preparation of will by principal beneficiary.** If it shall appear that any will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential

agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall affirmatively appear that the testator had read or knew the contents of such will, and had independent advice with reference thereto."

The trial court ruled K.S.A. 59-605 was inapplicable to the present situation, finding: (1) The scrivener was not the sole or principal beneficiary; (2) the scrivener was not acting on behalf of Charles and David when revising Mary's will and his actions could not be imputed to them; (3) Charles and David were not in a confidential relationship to Mary; and (4) because Charles and David each would receive less than one-half of Mary's estate, there was no sole or principal beneficiary within the meaning of the statute.

In order for K.S.A. 59-605 to apply, requiring independent advice, contestants must show that two conditions exist. First, the will must have been prepared by the sole or principal beneficiary and, second, the person who prepared the will must have been in a confidential relationship with the testator.

The contestants contend that the scrivener had a fiduciary relationship with Mary, Charles, and David, imputing his actions in drafting the anti-litigation or forfeiture clause to Charles and David. Contestants then assert that because the scrivener's actions must be imputed to Charles and David, and as Charles and David will inherit approximately 80% of Mary's estate after application of the forfeiture clause, they become the principal beneficiary.

The contestants also contend the relevant confidential relationship for purposes of applying K.S.A. 59-605 is the attorney/client relationship between the scrivener and Mary.

"K.S.A. 59-605 is a statute which legislatively reinforces the common-law doctrine of undue influence, which, in the absence of a statute, permits a court to deny admission of a will to probate under certain circumstances." *In re Estate of Robinson,* 231 Kan. 300, 306, 644 P.2d 420 (1982). The provisions of K.S.A. 59-605 "are not applicable unless the will was written or prepared by the sole or principal beneficiary therein, who was at the time of its preparation the confidential agent or legal advisor of the testator." 1 Bartlett, Kansas Probate Law and Practice § 388 (rev. ed. 1953).

Justice Prager in *Robinson* considered prior cases when he held that "[i]t is clear from the various decisions that the statute is not to be applied in a technical way to defeat a will, where to do so would defeat the clear intention of the testator." 231 Kan. at 305. He quoted from *Sellards v. Kirby*, 82 Kan. 291, 296, 108 Pac. 73 (1910), " ' The real question in each case is whether all the circumstances so far as shown are such as to lead the court to believe that in fact the will does not actually express the voluntary purpose of the testator,' " and opined, "Stated in another way, it is the obligation of the court to uphold the will, if by doing so it can carry out the true intent of the maker of the instrument." 231 Kan. at 305-06.

It is obvious that the scrivener has no pecuniary interest in the distribution of Mary's estate, as he is not a beneficiary under her will. See *In re Estate of Giacomini*, 4 Kan. App. 2d 126, 128, 603 P.2d 218 (1979) (Attorney not a beneficiary, although not only scrivener but also executor and trustee of charities receiving the bulk of the estate.).

Further, it is clear that under the facts and circumstances herein, the scrivener's actions cannot be imputed to Charles and David.

In *In re Estate of Schippel*, 169 Kan. 151, 218 P.2d 192 (1950), the principal beneficiary went to the office of an attorney and supplied the provisions to be included in the will. It was explained that the testator was too ill to come to town. About a month later, the will was executed by the testator, who expressed complete satisfaction with all of its provisions. The contestant sought to void the will under K.S.A. 59-605, contending the principal beneficiary caused the will to be written and prepared within the meaning of the statute. The will was upheld by a finding that the evidence clearly showed it was written exactly as the testator had directed the principal beneficiary to instruct the scrivener. Justice Price opined that:

"It may be conceded that under some circumstances a person occupying such a position of 'go-between' could be considered and held to be the one 'writing or preparing' a will within the meaning of the statute, but we do not think that any such inference or conclusion can be drawn from the evidence before us in this case." 169 Kan. at 161.

In *Klose v. Collins*, 137 Kan. 321, 20 P.2d 494 (1933), a will was challenged under R.S. 1923, 22-214, the forerunner of K.S.A. 59-605, by a contention that the attorney who prepared and wrote the will was in the employ of two beneficiaries who received the residue of the estate and, therefore, his work and advice was actually that of the beneficiaries and in their behalf. In rejecting this argument, our Supreme Court stated, "[T]he evidence fails to show that the will was either written or prepared by either of the beneficiaries and also fails to show that [the scrivener] was so under the control and supervision of them as to disqualify him as being able to give independent advice to the testatrix." 137 Kan. at 328.

The contestants' reliance upon *In re Estate of Alexander*, 12 Kan. App. 2d 516, 521, 749 P.2d 1052 (1988), is misplaced. The facts in *Alexander* were much more favorable towards the will contestants therein than the facts are here, yet their claims were rejected. In *Alexander*, the testatrix's will was prepared by the wife of the principal beneficiary and the question before the court was whether the actions of the wife as scrivener must, under K.S.A. 59-605, be imputed to the principal beneficiary solely because of their husband and wife relationship. We held that the relationship between the scrivener and the principal beneficiary did not amount to an automatic or per se violation of K.S.A. 59-605.

In so holding, we determined that the trial court's factual conclusion, that there was no fiduciary relationship between the wife and husband or between the wife and testatrix which would permit imputing the wife's actions as scrivener of the will to the husband, was correct. In reaching this determination, we relied upon the language in *Schippel*, which recognized there might be circumstances in which a person occupying a position of a "go-between" could be considered to be the one writing or preparing a will within the meaning of K.S.A. 59-605. We found the evidence clearly showed the wife prepared the will pursuant to the testatrix's request without any input from the husband. 12 Kan. App. 2d at 518.

In this case, the trial court's conclusion that the evidence did not establish that the scrivener was acting on behalf of Charles

and David when drafting Mary's will or that his actions could be imputed to them is supported by substantial competent evidence. See *In re Estate of Arney*, 174 Kan. 64, 69-70, 254 P.2d 314 (1953).

Howard testified that he knew from his association with Charles and David that each of them wanted Mary to make whatever disposition of her property she desired. He knew that neither Charles nor David were financially dependent on Mary, and their net worth far exceeded hers.

Howard had contacted Charles to locate Mary's 1979 will and her financial statement, but did not tell Charles why he was calling and received no input from Charles regarding preparation of the new will. Howard testified that he gave no consideration to what Charles and David might want in Mary's will; did not disclose the contents of Mary's will to them; did not feel they were a factor in determining the provisions to be included in Mary's will; and the only input in the preparation of Mary's will came from her.

Charles admitted that when Howard called him to locate Mary's prior will he guessed she was revising her will, but he did not know the contents of the will and was surprised when he learned about the anti-litigation or forfeiture clause. David was likewise surprised when he learned about the clause. The testimony is clear that neither brother made any suggestion to Howard about what to include in Mary's will. Neither brother was present during the conversations regarding the will and neither had input into its drafting or knowledge of its execution.

The evidence clearly revealed that Mary knew how she wanted to dispose of her property. There is nothing to show that Charles or David exercised any control or in any way were a "go-between" in drafting of the will. The scrivener's action in drafting the will cannot be imputed to Charles and David, nor can they be said to have written or prepared Mary's will within the meaning of K.S.A. 59-605.

The contestants' contention that Charles' and David's inheritance should be combined to satisfy the principal beneficiary requirement of the statute is also erroneous. In 1 Bartlett, Kansas Probate Law and Practice § 390, the following is stated:

### "What Constitutes Principal Beneficiary

" 'Principal' according to the dictionaries means main, chief, leading, highest in value, character or importance, most considerable or important. Every term of the definition used as the equivalent of 'principal' applies to one or to the share which one receives, who is given more than one-half of the estate. The statute cannot be interpreted as if it read 'the sole or one of the principal beneficiaries in the will.' In determining whether or not a person is the principal beneficiary in a will the relative importance of his share to the individual shares of other beneficiaries and to the whole estate should be considered. If two or more persons should receive the bulk of an estate in fairly equal proportions no one of them would be the principal beneficiary. If a single person should receive a share slightly larger than any other but which constituted only a small part of the entire estate, he could not be regarded as the principal beneficiary. The fact that a will is written by a daughter of the testator, who shares its benefits equally with other children, does not make a case for the application of the statutory provision. The statute relating to independent advice concerning wills applies to the single case of a will written or prepared by a beneficiary in confidential relation to the testator, who is given the whole or the chief part of the estate devised. If several beneficiaries receive fairly equal portions, the statute does not apply, and the validity of the will is to be determined by the ordinary rules relating to fraud and undue influence."

In *In re Estate of Barclay*, 215 Kan. 129, 134-35, 523 P.2d 376 (1974), our Supreme Court restated some guidelines for identifying the principal beneficiary in a will:

" ' The plaintiff would have the statute read "the sole or one of the principal beneficiaries." The legislature did not so frame it. It applies to the single case of a will written or prepared by a person in a confidential relation to the testator, who is given the whole or the most considerable part of the estate devised. In all other instances the validity of the will is to be determined by the ordinary rules relating to fraud and undue influence.

" 'In determining whether or not a person is the principal beneficiary in a will the relative importance of his share to the individual shares of other beneficiaries and to the whole estate should be considered. If two or more persons should receive the bulk of an estate in fairly equal proportions no one of them would be the principal beneficiary. If a single person should receive a share slightly larger than any other but which constituted only a small part of the entire estate, he could not be regarded as the principal beneficiary. Probably more specific directions than these can not be given; certainly nothing more definite is required by the facts of this case.' [Citation omitted.]"

Our Supreme Court in *In re Estate of Kern*, 239 Kan. 8, 17-18, 716 P.2d 528 (1986), summarily concluded two attorneys, a husband and wife, were "principal beneficiaries" under a will

devising and bequeathing the remainder of an estate to both of them. Because the will in *Kern* was not prepared by either beneficiary, but by an independent third-party attorney, the *Kern* holding does not critically involve the application of the statute. Nothing in the facts herein suggests that it would be proper to combine Charles' and David's shares of the estate so that both together may be considered the principal beneficiary for purposes of voiding the will under K.S.A. 59-605.

Cases in which the question of who is a "principal beneficiary" under the statute include *In re Estate of Porter*, 164 Kan. 92, 96, 187 P.2d 520 (1947) (statute not applicable to a trustee under a will); *Klose v. Collins*, 137 Kan. at 328 ("It may be very seriously questioned whether either of the [beneficiaries] in this case could be regarded as the sole or principal beneficiary as they were to share equally in the estate."); and *Stunkel v. Stahlhut*, 128 Kan. 383, 389, 277 Pac. 1023 (1929) ("[i]f several beneficiaries receive fairly equal portions, the statute does not apply").

We choose to follow the statement in 1 Bartlett, Kansas Probate Law and Practice § 390 that "[e]very term of the definition used as the equivalent of 'principal' applies to one or to the share which one receives, who is given more than one-half of the estate. . . . If two or more persons should receive the bulk of an estate in fairly equal proportions no one of them would be the principal beneficiary." See *Barclay*, 215 Kan. at 134.

The isolated statement in *Kern* is not binding authority to define a "principal" beneficiary. The language from all of the other cases cited where this was an issue teaches that the "principal" beneficiary cannot be interpreted as the contestants advocate.

The contestants have failed to establish that preparation of Mary's will was by a sole or principal beneficiary or by a beneficiary at all, or that any beneficiary was in a confidential relationship with her. As such, the question of independent advice of counsel becomes immaterial. *Robinson*, 231 Kan. at 306. Even if it were material, Mary did, in fact, receive independent advice from the scrivener who represented only Mary in preparation of her will.

K.S.A. 59-605 cannot be applied to impede the admission of Mary's will to probate.

*Is Item Nine void as contrary to the public policy of Kansas?*

The Kansas Constitution, Bill of Rights § 18, provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The contestants contend the anti-litigation or forfeiture clause is void as contrary to the public policy of Kansas because it places a substantial burden on the right of access to the courts. They contend if they utilize the courts for redress of injuries caused by other sons, Item Nine would result in the forfeiture or loss of their entire share of Mary's estate.

The proponents of the will point out that the conditional disinheritance provision is not a bar to the courthouse doors, but merely requires any son contesting the provision to make a choice. Proponents claim that no child of Mary has any right of inheritance, see K.S.A. 1992 Supp. 59-602, and, subject to 59-602, that the entire estate could have been left in any manner Mary selected. Proponents contend the relative wealth of the contestants is a factor in arguing access to the courts might be vital to those who would be left in a state of poverty or great need, but that contestants are wealthy, having received $770,000,000 from the sale of their Koch Industries stock in 1983, while the share of their mother's estate would be less than $1,000,000 each. Under these circumstances, proponents contend that Item Nine was an emotional appeal for unity, not an economic sanction.

Proponents contend Mary wanted her sons treated equally in her will, but only if the litigation was stopped. Finally, proponents contend Kansas has a strong public policy in favor of testamentary dispositions in accordance with the direction of a testator.

In construing a will, a court must give supreme importance to the intention of the testatrix. *Russell v. Estate of Russell*, 216 Kan. 730, 734, 534 P.2d 261 (1975). When the intent can be ascertained it will be given full effect unless contrary to law or public policy. *In re Estate of Cline*, 170 Kan. 496, 502, 227 P.2d 157 (1951).

Mary lawfully could have disinherited outright any of her four sons. See *Ginter v. Ginter*, 79 Kan. 721, 750-51, 101 Pac. 634 (1909). Item Nine, however, operates as a condition precedent

to Mary's sons inheriting under her will. "In a will, a 'condition precedent' exists when the performance thereof must of necessity precede the vesting of the gift." *In re Estate of Roberts*, 190 Kan. 248, 254, 373 P.2d 165 (1962). "A 'condition precedent' is a fact which must exist or occur before a duty of immediate performance of a promise arises." 190 Kan. at 254. "A condition precedent . . . must be strictly and wholly complied with in every particular before the estate shall vest." 1 Bartlett, Kansas Probate Law and Practice § 495 (rev. ed. 1953). The right of any son to inherit under Mary's will is conditioned upon that son dismissing litigation pending at the time of her death and is clearly a condition precedent to inheritance.

In disposing of her property, Mary had a right to impose any condition she pleased, provided it was not contrary to law or public policy. See *Salvation Army v. Watts*, 130 Kan. 714, 716, 288 Pac. 764 (1930). "The condition she imposes might appear to others to be finical or unimportant, but it is her own will, and if the condition is clearly expressed and indicates her purpose, it cannot be ignored or treated as unimportant." 130 Kan. at 716. " 'The right to make a will includes the right to make it according to the testator's own desire, subject only to the statutory restrictions. It is no condition of this right that the will shall please a jury, or a court, or the testator's relatives or anyone else.' " *Crowley v. Nixon*, 127 Kan. 178, 180, 272 Pac. 104 (1928).

The right of a testator to attach to a gift in his or her will any lawful terms seen fit is widely, if not universally, recognized. In considering any testamentary condition, the court must indulge a presumption in favor of its validity. 80 Am. Jur. 2d, Wills § 1548.

"When questions arise as to conditions or provisions being void as being against the public good or against public policy, great caution is necessary in considering them; at different times very different views have been entertained as to what is injurious to the public." 80 Am. Jur. 2d, Wills § 1548.

In *Baker v. Hickman*, 127 Kan. 340, 273 Pac. 480 (1929), one of the testatrix's daughters challenged provisions in a will that stated in the event the daughter was still married to her named husband at the time of the testatrix's death she would receive $1, but in the event the daughter was widowed or had obtained

a divorce from her named husband at the time of the testatrix's death, then she would share in the estate equally with the other daughter. The contesting daughter, still married to her named husband when the testatrix died, argued the provisions of the will tended to promote divorce or homicide and were void as against public policy.

Our Supreme Court rejected the daughter's arguments, stating:

"Generally speaking, a testator of sound mind and not under undue influence has a right to dispose of his property by his will as he pleases. . . .

. . . .

". . . A provision in a will cannot be said to be against the public policy of this state from the simple fact that the gift or devise depends upon whether or not an event has occurred which is in harmony with our statute and the public policy of our state." 127 Kan. at 342-44.

An *in terrorem* clause is a clause in a will in which a testator imposes upon a devisee or legatee a condition that he or she shall not dispute the provisions of the will or the gift shall be void. Our Supreme Court has determined that *in terrorem* clauses are to be given effect when a beneficiary attacks the validity of the will without probable cause to do so. See *In re Estate of Foster*, 190 Kan. 498, 500, 376 P.2d 784 (1962).

Contestants acknowledge their "extensive search" has located only two cases dealing with will provisions that contained anti-litigation clauses. In *Alexander v. Rhodes*, 63 Tenn. App. 452, 456, 474 S.W.2d 655, *cert. denied* October 18 (1971), the Rhodes' will in question contained a bequest to the testator's stepson conditioned upon a clause that read:

" '(a) That he cause to be dismissed all lawsuits which he has filed against me, or the Estate of [my deceased wife], . . . with prejudice, or in such manner that none of these actions can be reinstituted against my estate or personal representative. This election to take under this will, or to pursue the pending litigation, shall be made and implemented within thirty (30) days of the admission of this will to probate.' "

Alexander, the stepson, had three lawsuits pending against his stepfather, Rhodes, at the time of Rhodes' death. One lawsuit concerned the validity of Alexander's mother's will, which devised property to Rhodes; a second sought damages from Rhodes for the wrongful death of Alexander's mother; and a third sought to set aside a deed by Alexander's mother to Rhodes. After learning

of the clause in Rhodes' will, Alexander elected to continue with all litigation and freely admitted he had not complied with the condition precedent in Rhodes' will. Alexander, however, challenged the validity of the condition as against public policy.

The trial court found the clause in question void because it violated the public policy of Tennessee relating to access to the courts.

The Tennessee Court of Appeals reversed, holding the clause was not void as contrary to public policy, acknowledged Rhodes' intent was clear, and recognized "[t]he paramount and controlling law in the administration of wills is that the intention of the testator be carried out." 63 Tenn. App. at 460.

The Tennessee Court of Appeals construed the conditional bequest to be an offer to settle pending litigation, which is favored by public policy. The court recognized that had Rhodes died intestate, his estate would have passed by operation of law to heirs, which did not include Alexander. Since Alexander was legally owed nothing, the provisions of the will offered to settle pending litigation, which is favored by public policy. In stating that settlement of litigation and family compromise are encouraged and looked upon with favor, the Tennessee Court of Appeals opined:

"No doubt this view has been taken on the theory that a family in particular, and society in general, has little to gain by the public viewing of family grievances or disputes. If a compromise is not contrary to public policy, it must follow that an offer to compromise is not contrary to the public policy of this state." 63 Tenn. App. at 462.

The other case raised by contestants is *Sands Estate*, 66 Pa. D. & C. 551 (1948), an opinion from the Orphans Court of Montgomery County Pennsylvania. The provision considered there was in the will of a testatrix who had been a fiduciary in another estate. The will left property to nieces and grandnephews, some of whom had been legatees in the estate in which the testatrix had been the fiduciary. The provision in question would have revoked her bequest to any person who filed an exception to the accounting in the estate in which she was a fiduciary.

The probate judge noted that, if the testamentary forfeiture were enforced:

"A defaulting fiduciary could misappropriate the corpus of the trust, and the subject of his peculations possibly appear in his estate after his death. Such a testamentary forfeiture, if enforced, could put the beneficiary named in his will in the dilemma of taking under the will what in fact was already his, it having been stolen from him, or taking the hazard of litigation, with all its expenses, to obtain his due by seeking to surcharge the deceased fiduciary's estate." 66 Pa. D. & C. at 554.

The provisions in *Sands* are contrary to our situation, for there the beneficiaries were threatened with forfeiture if they attempted to litigate to obtain property to which they were legally entitled. In our case and in *Alexander v. Rhodes*, those facing possible disinheritance had no legal right to the property in question. We are not presented with the situation here of correcting an injustice which the decedent may have performed.

Although our Supreme Court has recognized the importance of an individual's right of access to the courts, it has taken the position that compromise and settlement of disputes between parties should be favored in the law in the absence of fraud or bad faith. *Kennedy v. City of Sawyer*, 228 Kan. 439, 454, 618 P.2d 788 (1980). Further, family settlements regarding the distribution of an estate are favorites of the law. *Brent v. McDonald*, 180 Kan. 142, 152, 300 P.2d 396 (1956).

It should be kept in mind that Mary had offered at one point to transfer all of her interest in the Foundation to Frederick in an attempt to assist the sons in effecting a settling of their differences and in reconciling the family ties. She had also been willing to leave all of her property to one or the other of the litigants if such would help end the continuing litigation.

We recognize that *Alexander v. Rhodes* is factually different, but its guiding principles and holding aid our ruling. Under Kansas law, Mary could have disinherited outright any of her sons and any son so disinherited would have received nothing from her estate. Mary instead clearly conditioned all of her sons' rights to inherit by use of the anti-litigation or forfeiture clause. The clause only applied to litigation pending at Mary's death, and had she died immediately following the execution of the will, Charles and David would have been faced with the same dilemma with which William and Frederick were faced because the specific performance suit in which they were plaintiffs remained pending.

Mary had no way of knowing what litigation might be pending at her death. She had no idea how long she would live, and matters could have been pending when she died that would have inured to the benefit of William and Frederick and to the detriment of Charles and David. We are not impressed with the contestants' argument that their case involved billions, while the specific performance case involved smaller amounts and the estate inheritance concerned only $1 million apiece, and we find this is not a valid reason to manufacture a public policy benefit to the contestants which does not exist.

The public policy of this state recognizes that a testator's intent reigns supreme. Heirs lawfully may be disinherited for no reason. Family settlements and the compromises of disputes are approved and access to the courts is not denied. We hold the anti-litigation or forfeiture clause in Mary's will is not void as contrary to public policy.

*Did the scrivener have a conflict of interest in revising Mary's will and drafting Item Nine so that the provision is void as the product of undue influence or constructive fraud?*

The contestants contend the scrivener had a conflict of interest in violation of Model Rules of Professional Conduct 1.7(a) and 1.7(b) (1992 Kan. Ct. R. Annot. 261) when he undertook to represent Mary in revising her will. This asserted conflict is claimed to have arisen because the scrivener was also representing Charles and David in intra-family litigation. This is claimed to have materially limited his ability to represent Mary.

The contestants assert this conflict of interest creates suspicious circumstances that, combined with the fiduciary relationship between the scrivener and Mary, create a presumption of undue influence, which the proponents have failed to overcome by clear and convincing evidence.

Frederick and William argue Mary's declining mental abilities caused by the effects of Alzheimer's disease left her more vulnerable to undue influence. They contend the scrivener influenced Mary to include Item Nine in her will by telling her that if it was what she wanted to do, it was advisable, and in failing to advise her why it might not be desirable or that some alter-

native should be considered. They assert the conflict of interest caused the influence of the scrivener to become undue influence.

Finally, the contestants base their assertion of constructive fraud on the scrivener's alleged conflict of interest, contending he breached a legal duty to Mary to either represent her without any conflict or to fully disclose any conflict to her and obtain her consent.

Proponents first argue there was substantial competent evidence supporting the trial court's failure to find an impermissible conflict of interest, requiring the decision be affirmed. They also argue that no conflict of interest exists and, finally, even if a conflict did exist, there was clear and convincing evidence that Mary's will was not the product of undue influence.

The trial court determined the scrivener was not materially limited by his responsibilities to Charles and David when he represented Mary in revising her will and that he did not violate MRPC 1.7. The trial court also ruled in the alternative that even if a conflict of interest was presumed, it would be so technical as not to create suspicious circumstances. A specific further finding was made that, assuming suspicious circumstances did exist, clear and convincing evidence rebutted any presumption of undue influence and established that Item Nine reflected Mary's unlimited testamentary intent.

In addition, the trial court determined there was no basis for constructive fraud, specifically finding the scrivener did not breach a duty to Mary, and, alternatively, that any alleged breach of the Model Rules of Professional Conduct would not be actionable by the contestants.

"No one can serve two masters; for either he will hate the one and love the other, or he will be devoted to the one and despise the other. You cannot serve God and mammon." *Matthew* 6:24, The Open Bible (New American Standard Version) (1979).

This biblical quote may represent the historical beginning of conflict of interest rules, but in *McArthur v. Fry,* 10 Kan. 233 (1872), a client was relieved from payment under a contract for legal representation because her attorney prosecuted a suit for another on a theory adverse to the client's interest concerning the same parcel of land involved in his representation of her.

The question of when an attorney for a husband in the original divorce action may later appear for the wife in the same action to modify the decree (the husband had died, and the custody of the minor child awarded to him by the initial decree was now being requested by the mother) was considered in the early 1900's. Such an appearance was deemed proper because the attorney was not required to violate any confidence reposed in him by his former client or do anything injuriously affecting his former client's interest. *Purdy v. Ernst,* 93 Kan. 157, 143 Pac. 429 (1914).

The history of the Model Rules of Professional Conduct adopted by the Kansas Supreme Court effective March 1, 1988, Supreme Court Rule 226 (1992 Kan. Ct. R. Annot. 238) can be traced to the Canons of Professional Ethics as first adopted by the American Bar Association on August 27, 1908. See 164 Kan. xi (1948).

According to the Prefatory Rule to Rule 226, the Model Rules of Professional Conduct are "general standards of conduct and practice required of the legal profession in Kansas." The interaction between the Canons and the Model Rules is stated in the following manner:

"To the extent that they are not inconsistent with the rules herein adopted or the statutory or case law of Kansas, the court also adopts in principle the preamble and comments accompanying the Model Rules, except as hereinafter modified. The Canons of Professional Responsibility numbered 1 through 9, adopted as part of Supreme Court Rule 225, continue as general statements of required professional conduct." Rule 226.

The provisions of Rule 226 supersede and supplement Rule 225 of the Code of Professional Responsibility. Rule 225, Canons 1 through 9, are preserved "as general statements of required professional conduct." Rule 226. See *Geisler By Geisler v. Wyeth Laboratories,* 716 F. Supp. 520, 524 (D. Kan. 1989).

Prior to the adoption of the MRPC, many decisions regarding conflict of interest relied on the notion of avoiding "even the appearance of professional impropriety." Criticism of the appearance of impropriety standard was widespread and that standard was not included in the MRPC. See Aronson & Weckstein, Professional Responsibility in a Nutshell, pp. 226-28 (2d ed. 1991). In determining attorney disqualification issues, the appearance of impropriety standard is specifically rejected in favor of a "function approach" concentrating on preserving confidentiality and avoid-

ing positions actually adverse to the client. See Comment, MRPC 1.10 (1992 Kan. Ct. R. Annot. 270, 272). The MRPC deals with actual conflicts and contains guidelines for use in recurring conflict of interest situations. The general rules are established in MRPC 1.7, and subsequent rules deal with common conflict of interest problem areas.

The parties have focused their arguments on the provisions of MRPC 1.7 (1992 Kan. Ct. R. Annot. 261), which state:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

The initial Comment to the Rule states: "Loyalty is an essential element in the lawyer's relationship to a client." However, in addressing other conflict situations, the comment continues:

"Conflicts of interest in contexts other than litigation sometimes may be difficult to assess. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise and the likely prejudice to the client from the conflict if it does arise. The question is often one of proximity and degree.

. . . .

"Conflict questions may also arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may arise." Comment, MRPC 1.7 (1992 Kan. Ct. R. Annot. at 264.)

The trial court limited the parties to two expert witnesses each on the conflict of interest issue. Charles W. Wolfram, a law professor at Cornell Law School who teaches legal ethics, professional responsibility, and civil procedure, and who currently

is involved in drafting the restatement of the law governing lawyers, testified on behalf of the contestants. He opined that the scrivener suffered under a conflict of interest as prohibited by MRPC 1.7(b) when working on the revision of Mary's will.

Warren R. Southard, a practicing Wichita attorney and a member of the Wichita Bar Association ethics committee for 15 years, also testified on behalf of the contestants and concluded that the scrivener had a conflict of interest under both MRPC 1.7(a) and MRPC 1.7(b).

Geoffrey C. Hazard, professor of law at Yale University Law School and executive director of the American Law Institute (ALI), testified for the proponents of the will. As executive director of the ALI, Hazard's duties include supervising the drafting of the restatement of the law governing lawyers and serving as reporter for the Kutak Commission, which wrote the Model Rules of Professional Conduct recommended by the American Bar Association. He opined there was no conflict of interest or violation of MRPC 1.7(a) or MRPC 1.7(b).

Jack Focht, a practicing attorney in Wichita who served a two-year term on the Wichita Bar Association ethics committee and whose practice includes representing lawyers in disciplinary matters, also testified on behalf of the proponents and concluded no conflict of interest existed under MRPC 1.7(a) or MRPC 1.7(b).

The trial court weighed the conflicting opinions and concluded the scrivener did not have a conflict of interest.

This issue might easily be resolved by holding the case was tried under a pretrial order not objected to by the contestants that stated the conflict of interest issue was a question of fact. The standard of appellate review of findings of fact has been stated numerous times. We must determine if the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusion of law. *Army Nat'l Bank v. Equity Developers, Inc.,* 245 Kan. 3, 19, 774 P.2d 919 (1989). "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Williams Telecommunications Co. v. Gragg,* 242 Kan. 675, 676, 750 P.2d 398 (1988).

The proponents contend that the contestants, having been unsuccessful on their factual argument, now make an impermissible shift in focus and argue on appeal that the issue is a matter of law. While we believe there is a sufficient record to sustain this argument as a basis for affirming the trial court, our research supports the conclusion that the determination of whether an attorney suffers under a conflict of interest is a question of law, while the determination of whether that conflict coupled with a confidential relationship resulted in an imposition of undue influence upon the testatrix is a question of fact.

In *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980), when reviewing the district court's power to disqualify an attorney, the Third Circuit determined the issue of whether the American Bar Association disciplinary rule prohibited certain professional conduct is a question of law subject to plenary review. The Supreme Court of New Jersey in *Haynes v. First Nat'l State Bk. of N.J.*, 87 N.J. 163, 432 A.2d 890 (1981), a case relied on by both the contestants and proponents to support their respective positions, treats the issue as one of law in its analysis. Further, the proponents' expert witness, Professor Hazard, testified that whether a conflict of interest exists is a legal question.

We hold the trial court's determination that the scrivener was not operating under a conflict of interest when he revised Mary's will is a conclusion of law over which this court has unlimited review. See *Hutchinson Nat'l Bank & Tr. Co. v. Brown*, 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

The approach we choose to take in resolving this issue will guide our decision as to whether a conflict actually existed.

If we choose to adopt a highly theoretical analysis, it is possible to make an elusive argument and "find" a conflict. If, however, we take a down-to-earth, real world, functional approach in which we insure that confidentiality is preserved and that the client's wishes are served, we are hard pressed to find any ethical violation upon which additional legal arguments can be hinged.

The parties have not attempted, and rightly so, to make a Canon 9 (1992 Kan. Ct. R. Annot. 231) "appearance of impropriety" argument, although there are suggestions of such in the contestants' contentions. The Canons of Professional Responsi-

bility Nos. 1 through 9 continue as general statements of required professional conduct; however, MRPC 1.7 deals specifically with the issue raised herein and the arguments of able counsel have properly focused on its provisions.

The extent to which theoretical conflicts can be imagined is pointed out by the hypothetical examples used in a recent Kansas Bar Association professional ethics seminar. See Martin, *Ethics in the Practice of Probate, Trust and Estate Planning* in Ethics & The KBA Lawyer, 6-1 (July 12, 1991). It was suggested there that a conflict of interest problem may exist in representing both a husband and wife, in representation of the family unit, and in representing family members in a closely held family corporation.

Wolfram in his book Modern Legal Ethics § 7.1, p. 330 (1986), presupposes his testimony herein when he stated: "[A] conflict of interest on the part of a lawyer who drafts for one client a will that benefits another can have the collateral effect of creating a strong presumption that the will was obtained by undue influence and thus is voidable" (citing *Haynes v. First Nat'l State Bk. of N.J.,* 87 N.J. 163).

The New Jersey Supreme Court in *Haynes* applied DR 5-105, which appears to be identical to Kansas Rule 225, DR 5-105 (1992 Kan. Ct. R. Annot. 211), in holding:

"In this case there were suspicious circumstances attendant upon the execution of the will. There was a confidential relationship between the testatrix and her attorney, who was also the attorney for the daughter and the daughter's immediate family. Furthermore, following the establishment of the confidential relationship of the daughter's attorney with the testatrix, there was a drastic change in the testamentary dispositions of the testatrix, which favored the daughter. These factors collectively triggered the presumption that there was undue influence in the execution of the will." 87 N.J. at 177.

The facts in *Haynes* were materially different from those of our case. In *Haynes,* the testatrix was living with a daughter who pressured her to change her will from dividing her estate between two children, or their families, to a plan which gave most of the estate to the daughter. That daughter's attorney displaced the testatrix's longtime attorney and radically revised an existing estate plan.

The trial court held the presumption of undue influence had been overcome by a preponderance of the evidence. While recognizing evidence existed in the record to support the trial court's conclusion, the case was remanded for application of the clear and convincing standard of proof, and further consideration of the scrivener's conflict of interest, whose testimony was crucial to the outcome of the case. 87 N.J. at 185-86.

In our case, the scrivener had no contact with Mary's children in connection with the formulation of her estate plan. Charles and David never discussed with the scrivener or with their mother the provisions of her will. The material difference in the facts limits the persuasive effect of *Haynes*. There are also different ethical provisions involved, although DR 5-105(B) does relate to "exercise of independent professional judgment" while MRPC 1.7(b) states a lawyer shall not represent a client "if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person."

The scrivener in *Haynes* may or may not have been able to exercise "independent professional judgment," but we do not see where Mary's scrivener was limited by responsibilities to another client.

See also *Pascale v. Pascale*, 113 N.J. 20, 549 A.2d 782 (1988) (attorney may not, without making appropriate disclosure, simultaneously represent the testator and beneficiaries of a will); *Harper v. Watkins*, 670 S.W.2d 611, 627 (Tenn. App. 1983) (no suspicious circumstances since will was not prepared by a lawyer who was also the beneficiaries' attorney), appeal denied Tenn. (1984); Wolfram, Modern Legal Ethics § 7.3.4, pp. 356-57 (a conflict of interest exists when the attorney arranges for one client to sign a will leaving substantial property to another client). Compare *Blissard v. White*, 515 So. 2d 1196, 1200 (Miss. 1987) (Attorney was competent to render legal advice to testatrix despite the fact he had done legal work in the past for the beneficiary. "Indeed, were we to disqualify Sibley's advice, we would create a trap which would void bona fide gifts and bequests among family members in small towns and rural areas all over this state."); *Matter of Estate of Ross*, 316 Pa. Super. 36, 44, 462 A.2d 780 (1983) (Scrivener had no conflict of interest in representing the

testatrix when scrivener had merely performed legal services for the beneficiary in the past.).

We have previously set forth herein the relevant factors that should be considered in determining if a conflict exists. See Comment, MRPC 1.7 (1992 Kan. Ct. R. Annot. at 264). We will discuss each and its applicability to this case.

a. Duration and intimacy of the lawyer's relationship with the client or clients involved.

The scrivener had known Mary for a number of years. Howard had served with her on the Wichita Art Association Board. He was representing her in the second Foundation case at the time Mary requested him to revise her will.

Mary was clearly *the* client. It was her wishes that were being considered. She had confidence in Howard's representation of her in other matters, and it was logical she would expect him to provide legal services to her in the revision of her will. The duration and intimacy of the scrivener's relationship with the testatrix is not a basis upon which a conflict of interest would exist.

b. The function being performed by the lawyer.

The function performed here was the revision of Mary's will. The changes she wanted were straightforward. It was logical for Howard to call on a specialist from his firm to assist him in satisfying the desires of a valued client. Mary never connected the revision of her will with any other matter except for her unhappiness with the family litigation. She was not concerned with the merits of the litigation, only its existence.

Lawyers routinely perform different services for the same client. The function here was to revise a will. It was done in accordance with Mary's instructions without any evidence of extraneous considerations.

Howard clearly held to his directed function as scrivener of Mary's will. His other functions as Mary's counsel in the Foundation case and as counsel to David and Charles in the Foundation case and the 1985 fraud case are not shown to have adversely affected the service he was employed to provide to Mary.

### c. The likelihood that actual conflict will arise and the likely prejudice to the client if it does arise.

This is not a situation where an actual conflict might arise at a future date. It either existed at the time the will was being revised or it did not.

The likely prejudice to Mary is a different and much more difficult concept to analyze.

Howard and Harris discussed asking Philip Bowman, a Wichita attorney, to become involved in the revision of Mary's will. Bowman declined because of a conflict of interest (his firm subsequently entered its appearance for William in the coins/real estate case and for William, Frederick, and other plaintiffs in the stock fraud case). Howard knew there might be litigation over the will. If he were to be the scrivener and litigation resulted, he was bound to be a witness.

Under these circumstances, did Howard have an obligation to withdraw from the representation of revising Mary's will? Hazard testified that Howard should not turn down representing Mary under these circumstances, stating:

"And there would be a very serious question for a competent lawyer in turning down Mrs. Koch in these circumstances, because that's the alternative, to say I can't do this. And I think most lay people in Mrs. Koch's situation would think well, why in heavens not, why can't you help me in this matter of importance. And I think those are the right terms in which a—an aware, sensitive lawyer concerned about the interests of clients looks at things. I believe lawyers have to be hard-boiled but I think they have to be aware of—deeply aware of human sentiment and particularly in a matter of this sort."

Howard did not contact any other independent lawyer, nor do we feel that he was compelled to do so. He had no way of knowing what litigation, if any, would be pending between Mary's sons at the time of her death. There was no pressure on him from any source as to what should be included in Mary's will. It was her will, her ideas, her directions, and her wishes that were to be served.

The scrivener is not to be charged with perfect hindsight nor with the ability to predict how and upon whom a will provision may fall. The scrivener must be loyal to his client, and that existed here. The scrivener must follow his client's directions, and that

existed here. Conflicts and prejudices are questions of "proximity and degree," Comment, MRPC 1.7 (1992 Kan. Ct. R. Annot. at 264), and utilizing our "down-to-earth," "real world," "functional" approach we cannot see where any impermissible conflict of interest existed.

### d. Other factors to be considered.

Hazard also pointed out in justifying the scrivener's actions that while Mary's estate is substantial by most parties' standards, it is small by comparison to her sons' net worths, and if they do not receive any financial benefit from her estate, it will not amount to a financial detriment to any of them or in any manner affect their economic well-being.

We are as unimpressed by this argument as we were by the contention of the contestants to the will that public policy somehow was violated by the sons' having to give up their right to inherit Mary's millions in order to pursue their stock fraud case for billions. The amount of money claimed to be involved in one instance or another is *not*, in our opinion, a factor which should aid in determining conflicts of interest or matters of public policy.

We do agree with Hazard's opinion that the long-term consideration by Mary of her family situation and the fact her testamentary plan made sense are factors to consider in determining if a conflict exists. It is extremely important to recognize that Mary's will was to be equally applied to her four children. *She did not treat them differently. She treated them in the same manner.*

If Mary had died immediately after executing the will, Charles and David would have been under the same burden in the coins/real estate case as Frederick and William were under in the second Foundation case and the stock fraud action.

### e. Should other factors have been considered?

Wolfram and Southard testified the scrivener was obligated to advise Mary about the merits of the stock fraud case, that Item Nine would surely result in litigation, that other methods might better resolve the family litigation (arbitration or mediation, for example), or that she should consider a lesser sanction than complete disinheritance.

Both Hazard and Focht testified that such questioning was not necessary and was highly theoretical, and that suggesting the employment of an independent third-party counsel to give Mary an opinion about the merits of all pending and past litigation was totally ridiculous. We agree with this analysis. Mary had said "please stop" to her sons. She had offered to give away her Foundation stock in order to settle problems. She had suggested arbitration and mediation. What, in effect, had happened was that she had lost any financial control over her children because their wealth had far exceeded hers.

All Mary could do was make a testamentary plea for an end to the family litigation. The fact this effort has been totally ineffective does not compel us to find an imagined conflict on the part of her scrivener to void her testamentary wishes.

We hold that as a matter of law Howard was not in a conflict of interest position and that MPRC 1.7(b) was not violated.

We understand the basis for Southard's opinion that MRPC 1.7(a) was violated because of Howard's representation of Mary, Charles, and David. We agree, as a matter of law, with the opinions of Hazard, Wolfram, Focht, and the trial court that a violation of MPRC 1.7(a) did not exist. If we were to adopt Southard's approach, Focht's testimony that such "would make it impossible for the family lawyer in Kansas to draft a will for any family with which he was half-way familiar" would not be as farfetched as it might otherwise seem.

The scrivener's representation of clients who may become beneficiaries of a will does not by itself result in a conflict of interest in the preparation of the will. Legal services must be available to the public in an economical, practical way, and looking for conflicts where none exist is not of benefit to the public or the bar.

We have previously set forth two valid reasons why the contestants' conflict of interest/undue influence argument is without merit. We now set forth the third reason fatal to the contestants' argument. Even if there existed a conflict of interest resulting in a presumption of undue influence, that presumption is overcome by clear and convincing evidence.

It is well established that

"'[w]here a will is offered for probate, the burden of proof in the first instance is upon the proponent to make a prima facie case showing due execution of the will. When such a prima facie showing has been made, the burden shifts to the contestant to overcome that showing by clear, satisfactory and convincing evidence. [Citations omitted.]" *In re Estate of Perkins,* 210 Kan. 619, 624, 504 P.2d 564 (1972).

Our Supreme Court in *Ginter v. Ginter,* 79 Kan. 721, Syl. ¶ 1, 101 Pac. 634 (1909), opined:

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind."

The burden of proof to overcome the presumed validity of the will rests upon whoever alleges undue influence. 79 Kan. 721, Syl. ¶ 3. The ultimate question is: Is the document produced the testator's last will?' " 'To make a case of undue influence the will must express the mind and intent of some one else, and not of the testator.' " 79 Kan. at 740-41.

In *Haynes v. First Nat'l State Bk. of N.J.,* 87 N.J. 163, 176, 432 A.2d 890 (1981), the Supreme Court of New Jersey stated the rule that when undue influence is alleged

" 'the burden of proving undue influence lies upon the contestant unless the will benefits one who stood in a confidential relationship to the testatrix and there are additional circumstances of a suspicious character present which require explanation. In such case the law raises a presumption of undue influence and the burden of proof is shifted to the proponent.' [Citation omitted.]"

See *In re Estate of Brown,* 230 Kan. 726, 732, 640 P.2d 1250 (1982).

In this case, the proponents of Mary's will made a prima facie case showing due execution of the will. The burden then shifted to Frederick and William to show undue influence. To shift the burden of proof back to the proponents required more than Howard's alleged conflict of interest. A confidential relationship between Mary, Charles, and David was also required.

" 'A confidential relation exists whenever trust and confidence is reposed by the testator in the integrity and fidelity of another, but the existence of such relation between the testator and the

favored beneficiary, standing alone, does not constitute undue influence.' " 230 Kan. at 732. A confidential relationship arises when " 'trust is reposed by reason of the testator's weakness or dependence or where the parties occupied relations in which reliance is naturally inspired or in fact exists.' " 87 N.J. at 176.

In the context of ruling on the applicability of K.S.A. 59-605, the trial court concluded:

"Although there was testimony that Mary Koch trusted Charles and David Koch and had confidence in them, the evidence fails to establish that Charles or David Koch had a confidential or fiduciary relationship with Mary Koch within the meaning of K.S.A. 59-605."

Frederick and William continue to allege, despite the trial court's factual findings to the contrary, that a confidential relationship existed involving Mary, Charles, and David.

The trial court's ruling is a negative finding, which, absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, cannot be disturbed. See *Mohr v. State Bank of Stanley,* 244 Kan. 555, 567-68, 770 P.2d 466 (1989).

The relationship of parent and child, without more, does not establish a confidential relationship. See *Jernberg v. Evangelical Lutheran Home for the Aged,* 156 Kan. 167, 174, 131 P.2d 691 (1942). Although the record reveals Mary consulted with Charles on occasion about the management of her affairs and Koch Industries provided Mary with tax, accounting, legal, and insurance services for which the company was reimbursed, the record does not show any dependence by Mary on either Charles or David sufficient to sustain a confidential relationship.

Not only was there no confidential relationship between Mary and Charles or David, but the contestants' claim that the fiduciary relationship between Mary and Howard was a confidential relationship sufficient to create a presumption of undue influence is without merit.

It is well known that the relationship between attorney and client is fiduciary in character. *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 261, 553 P.2d 254 (1976). Some support for Frederick's and William's position is found in *In re Adoption of Irons,* 235 Kan. 540, 684 P.2d 332 (1984), in the context of a contested adoption in which our Supreme Court determined

the natural mother's doctor and her lawyer were both in a confidential relationship with her. The court found those confidential relationships coupled with the suspicious circumstances that the natural mother's lawyer was her doctor's daughter was enough to shift the burden to the adopting parents to prove the natural mother's consent to the adoption was free and voluntary. 235 Kan. at 547-49.

*Irons* is factually distinguishable. In the context of a will contest, the authorities are clear that the triggering confidential relationship is that between the testator and the beneficiary. *Haynes,* 87 N.J. at 176; *Matter of Estate of Weickum,* 317 N.W.2d 142, 145 (S.D. 1982); *Harper v. Watkins,* 670 S.W.2d 611, 627-28 (Tenn App. 1983).

The trial court determined that even if a presumption of undue influence existed, it had been overcome by clear and convincing evidence. When the issue is whether the evidence supports the trial court's finding of a lack of undue influence, it has been stated:

" 'The usual rules of appellate review hold true in cases involving a trial court's ruling on the issues of testamentary capacity and undue influence. In short, this court will not weigh conflicting evidence but will look only to see whether substantial competent evidence exists to support the findings of the trial court.' [Citations omitted.]" *In re Estate of Kern,* 239 Kan. 8, 14, 716 P.2d 528 (1986).

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.] Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Williams Telecommunications Co. v. Gragg,* 242 Kan. 675, 676, 750 P.2d 398 (1988).

The contestants have not appealed the trial court's determination that Mary had testamentary capacity and was able to understand Item Nine of her will. Frederick and William contend that Mary was more susceptible to influence because of the effects of Alzheimer's disease and other diseases of the brain and that Howard, because of his conflict of interest, unduly influenced Mary to include Item Nine in her will by telling her that her desire to attempt to stop the litigation through her will was

advisable and by failing to advise her of the reasons she might not want to include Item Nine in her will.

"It is a fundamental rule of testamentary construction that, whenever possible, the testamentary plan or scheme of the testator be upheld and given effect." *Dittmer v. Schmidt,* 235 Kan. 697, 700, 683 P.2d 1252 (1984). In this will contest, voluminous evidence relating to Mary's testamentary intent was considered by the trial court.

Throughout her life, Mary professed an unchanging love for all her sons. The record contains a plethora of evidence, consisting of the testimony of her relatives including Frederick, friends, doctors, and the will's scrivener, that she was appalled and distressed for a period of almost 10 years prior to her death by the disputes and lawsuits involving her sons and the resulting publicity.

Most poignant and haunting are the words written by Mary's own hand in letters to her sons. We will set forth only a small part of a record which shows years of frustration over the disintegration of her family unit.

Following the hostile takeover attempt, Mary wrote Frederick on January 4, 1981:

"It is tragic that this disagreement has become such a bitter and personal fight and I hope and pray some peace and reconciliation can be reached."

On December 3, 1981, Mary wrote to William:

"There must be some giving on both sides to resolve anything. As for negotiations could you and Charles each appoint a representative familiar with the problems and they appoint a third unprejudiced person to meet and discuss all sides and also estimates from both parties of the value of Koch Industries stock should be given and then come to some compromise.

"If you feel that the price for your and Freddie's stock is not enough then I will personally try to make up the difference by giving you and Freddie all of my Koch Ind. preferred stock."

In July 1982, Fortune magazine published an article about the Kochs entitled "Family Feud at a Corporate Colossus." On July 14, 1982, Mary wrote to William that she was "shocked" by the article and its "character assassination" of Charles.

Following the filing of the 1982 lawsuit, Mary wrote to Frederick on October 19, 1982:

"The lawsuit . . . had disturbed and saddened me deeply. I am relieved that you are not part of it. I am trying with all my strength to influence Billy to withdraw it."

On October 19, 1982, Mary also wrote to William:

"Billy, . . . I do criticize you for the way you have handled things. You have judged Charles in a cruel and jealous manner . . . . If you had been more rational and less emotional you would have been listened to by Charles and David and could have accomplished a great deal."

In June 1983, a Stock Purchase and Sale Agreement was entered into, resulting in Koch Industries purchasing Frederick's and William's stock. On July 10, 1983, Mary wrote to William:

"I hope you are as relieved as I and others are that the lawsuits have been settled out of court. Now we can all sleep better and concentrate on living and enjoying life."

The tranquility in Mary's life was short-lived, and after the first Foundation disagreement broke out, Mary wrote to Frederick on October 26, 1984: "The disagreement over the Fred C. Koch Ftd. has hurt me also."

On June 7, 1985, the "1985 case," which is still pending, was filed. Frederick testified that the start of another lawsuit in the family would be a terrible blow to Mary. David testified the litigation "ate away at her like cancer . . . and she was always so sad and unhappy about it. God, it just broke your heart to see mother react this way towards it."

In 1987, William filed the first Foundation case, specifically naming Mary as well as Charles, David, the Fred C. Koch Foundation, and others as defendants. David testified about the effect on Mary of being sued by William:

"[S]he was just overwhelmed by it and shocked beyond belief that her son Billy would include her. I remember her saying that, God, after all the money and things I've done for Billy why would she sue him [sic]. She kept saying he has millions, he has millions, why does he want to sue me over the small amount of money that's involved in the foundation."

On May 19, 1988, Frederick joined William in filing the second Foundation case, again specifically naming Mary as a defendant. Frederick acknowledged that the second Foundation case in which he joined William in suing Mary "would be the deepest hurt . . . of all."

Mary had been required to give a deposition in the second Foundation case in August 1988. David was present at the deposition and testified he had never seen Mary "more tense, more nervous and more high strung" and the deposition "really devastated her." Mary broke down in tears during the deposition when she was asked to read a letter she had written to Frederick pleading for peace in her family during the last years of her life.

Trial of the second Foundation case began on April 25, 1989. Mary was subpoenaed to testify at trial; she was "terrified" to think of testifying and taking sides among her four sons. Mary's physician testified that the stress of testifying would put her at physical risk, and the court granted a motion to quash the subpoena.

We will not attempt to summarize the testimony of Michael Oliver, William Tinker, Sr., Constance Witterman, Marcellette Davis, Dr. Albert Michelbach, Charles, and David, all of whom testified as to Mary's strong will and continuing determination to make the decisions affecting her life. Each related experiences that showed Mary as an intelligent, independent person not susceptible of undue or any influence to do something she did not want to do. The testimony of each is consistent and upholds the trial court's decision.

Although there is evidence Mary suffered some effects of Alzheimer's disease as early as 1988, the severe effects of this disease and other brain diseases with which Mary was afflicted did not fully manifest themselves until 1990.

It is clear the family litigation had a profound effect on Mary and that she wanted to find a way to express in her will, one last time, her displeasure over the lawsuits and her desire that the fighting among her sons finally cease.

The evidence clearly and convincingly reveals Mary was not subject to undue influence when she expressed her wishes to the scrivener and subsequently approved Item Nine, which "captured what she wanted to do." The clause simply states Mary's intentions as expressed many times during the years preceding her death.

Between January and August of 1989, Mary reviewed three drafts of her will. She had the opportunity to reflect on the inclusion of the forfeiture clause in her will. During the execution

of the will, she acknowledged Item Nine expressed her understanding and intent and stated "she wished that the boys would quit fighting."

In this case, there is substantial competent evidence to support the trial court's conclusion that the evidence clearly and convincingly shows Mary was not subject to undue influence when she revised and executed the will of August 11, 1989.

Further, the will is not void as the product of constructive fraud, which is defined as "a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty of purpose or intent to deceive is necessary." *Moore v. State Bank of Burden,* 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987).

Howard did not breach his duty to Mary to represent her free of conflicting interests or fail to disclose the conflict to her and obtain her consent pursuant to MRPC 1.7 (1992 Kan. Ct. R. Annot. 261). The contestants' constructive fraud argument fails along with the failure of their conflict of interest and undue influence arguments.

The parties have not raised or briefed as an issue on appeal the trial court's ruling that any alleged breach of the Model Rules of Professional Conduct would not be actionable by the contestants, and we consider this issue to have been abandoned. *Brubaker v. Branine,* 237 Kan. 488, 490, 701 P.2d 929 (1985).

Under each of our analyses, the trial court's decision is correct for the many reasons stated. If the contestants are bound by the pretrial order, there is substantial competent evidence to sustain factual findings of no conflict, no undue influence, and no constructive fraud. The common-sense analysis of MRPC 1.7 compels a finding that the scrivener was not in a conflict of interest position as a matter of law. If in fact or in law a theoretical conflict of interest could be found, clear and convincing evidence showed Mary was not subject to undue influence and Item Nine was the product of her free will and wishes.

*Item Nine of Mary's will is applicable to Item Four and the memorandum disposing of tangible personal property.*

Contestants first argue that because the pretrial order reserved the issue of whether Item Four and the memorandum disposing of personal property was subject to the provisions of Item Nine of the will, we should remand this issue for the presentation of evidence and trial.

The trial court reached this issue and made a ruling thereon based upon the wording of the will. Both parties have presented this issue to us on appeal. Under these circumstances, we hold this issue is a matter of law which can and should be disposed of at this time in the interest of judicial economy.

Item Four of Mary's will provides:

"ITEM FOUR: Subject to the provisions of ITEM NINE hereof, I hereby give and bequeath unto my sons who survive me (I presently have four sons—Frederick R. Koch, Charles G. Koch, William I. Koch, and David H. Koch), share and share alike, to be theirs absolutely, all of my household goods, furniture, furnishings, ornaments, books, pictures, provisions, silverware, glassware, china, consumable goods, wearing apparel, jewelry, watches, personal effects, and all other items of a personal or household nature, of whatsoever kind or nature and wheresoever situate. As among my said sons, said assets shall be divided in such manner as they may agree, but if my sons are unable to agree as to the division thereof, my executor shall have full power and authority to divide said assets in such a manner as my executor shall deem fair and equitable.

"In addition to the foregoing, if I should execute a statement or memorandum disposing of any items of tangible personal property which refers to this Item of my will and is witnessed by two witnesses, I direct that such statement or memorandum shall be given full force and effect, and it shall supersede the provisions of this Item to the extent necessary to carry out its terms."

At the time Mary executed her will, she also executed a memorandum directing the disposition of specific items of tangible personal property as authorized by K.S.A. 59-623.

Frederick and William contend the memorandum, which designated them as recipients of valuable items of art, is not subject to the provisions of the anti-litigation or forfeiture clause set forth in Item Nine of Mary's will.

In *Dittmer v. Schmidt,* 235 Kan. 697, 700, 683 P.2d 1252 (1984), Justice Lockett stated:

"It is a fundamental rule of testamentary construction that, whenever possible, the testamentary plan or scheme of the testator be upheld and given effect. The primary function of a court in the interpretation of a will

is to ascertain the testator's intent as derived from the four corners of the will. Extrinsic evidence of the testator's intent may not be admitted to give unambiguous language of his will a different meaning."

The specific wording of Item Nine revokes all legacies and bequests to any of the sons who failed to comply with the directions concerning litigation pending at Mary's death. The second paragraph of Item Four removes the items disposed of by the supplemental memorandum from the general dispositive provisions of Item Four, but it is clear the overall plan makes all devises and bequests subject to the provisions of Item Nine.

We hold the language of Item Four is clear and unambiguous that any bequests, including those in the supplemental memorandum, are subject to the anti-litigation or forfeiture provisions of Item Nine.

The trial court properly construed the will. Evidence on this issue is not allowable. The prohibition of Item Nine is binding upon Frederick and William, who are precluded from receiving any bequests provided for in Item Four and the supplemental memorandum thereto.

We have considered each issue raised by the contestants. If we have not commented on every argument under each issue, every argument was nevertheless considered and found to be without merit.

Affirmed.