No. 53,359

In the Matter of the Estate of Guy Brown, Deceased.

DALE BROWN, WILMA KUGLER and ALFRED BROWN, *Appellants,* v.
ELMER BROWN, ROY C. BROWN, VIOLET BROWN CROWDER, SHARON
K. BROWN, ORRIS BROWN and ELSIE GOLDBERG, *Appellees.*

(640 P.2d 1250)

Opinion filed February 27, 1982.

*Stephen W. Cavanaugh,* of Fisher, Ochs, and Heck, P.A., of Topeka, argued the cause and *James R. Martin,* of James R. Martin, Chartered, of Topeka, was with him on the brief for the appellants.

*John F. McClymont,* of Ryan, Kent, Wichman, Walter & McClymont, Chartered, of Norton, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

HERD, J.: This is an appeal from an order denying the admission of the will of Guy Brown to probate. Appellants are Dale Brown, Alfred Brown and Wilma Kugler Wolf, nephews and niece of the testator. Appellees are Elmer Brown, Roy Brown, Violet Crowder, Sharon K. Brown, Orris Brown and Elsie Goldberg, other nephews and nieces of Guy Brown.

Guy Brown suffered from arteriosclerosis, a disease of progressive development with attendant symptoms of confusion, forgetfulness, disorientation, etc. Mr. Brown's bout with the disease began in 1973. Wilma Kugler Wolf and her parents lived in the same house with Guy Brown part of ı er life. She remained close to Guy and took care of him when he needed it. When the weather was nice she took him out every Tuesday for a malt. Wilma assisted Guy in obtaining medical, legal and financial help.

In December, 1974, Guy Brown was injured in an auto-pedestrian accident. Subsequently, he entered into a voluntary conservatorship. Linton Lull was the conservator.

In March of 1975, Guy moved to Carpenter Manor, a nursing home in Smith Center, Kansas. In June, 1975, during the stay at Carpenter Manor, Terry Relihan, an attorney who had performed

some legal work for Guy in the past, saw Guy there. He testified "he [Guy] did not know me from Adam." At some time before Guy's entry into Carpenter Manor, Wilma Kugler Wolf had a confrontation with Roy Brown and Ella Brown, Guy's sister-in-law, in a local store. Ella allegedly intentionally spilled a Coke on Wilma. This infuriated Wilma and she wrote an anonymous letter to Guy urging him to put "Roy and Ella in thier [sic] place." The letter continued, "Weather [sic] you realize it Wilma has treated you like a farther [sic]. When ever I talk to her she was always worried about your health and welfare. . . . I don't like to see thier [sic] [Wilma's parents] daughter [Wilma] treated like a dog. . . . thay [sic] [Roy and Ella] don't even have good teeth, thay [sic] are known for thier [sic] serpent tongues." Initially Wilma denied knowing anything at all about the letter or even having made any derogatory remarks about Roy Brown. Later she recanted and admitted she wrote the letter in retaliation for the Coke incident.

In December of 1975, Wilma Kugler Wolf moved Guy to the Webster County Hospital in Red Cloud, Nebraska, where she lived. On January 8, 1976, Guy began living at the Sprague Nursing Home in Red Cloud. He remained there until his death.

While he was in the Sprague Nursing Home Guy was taken care of by Allene Giger, an LPN. Ms. Giger's notes during January indicate Guy was confused and during February confused and depressed. During this time, Guy was taking Percodan for pain and Hydergine, a vasodilator. Ms. Giger testified the Hydergine made Guy more alert. She also testified Guy seemed to be bothered by visits from Wilma.

Dr. Francis Obert was Guy's physician during the first three months of 1976. Although he did not see Guy between February 2 and March 1, 1976, he testified when he did see Mr. Brown "his judgment seemed to be pretty good" at that time. Dr. Obert also wrote "He [Guy] seemed confused at times, but generally was oriented and mentally stable, clear and rational." Dr. Obert testified the only side effect from Percodan was possible addiction.

On February 16, 1976, Guy Brown left the Sprague Nursing Home, for the night, with Wilma Kugler Wolf. The next day, he went with Wilma to see William Letson, a local attorney Wilma had contacted. They inquired about the preparation of a will. Mr. Letson talked to Guy, got an idea about how he wanted to

distribute his property, and roughed out a will. After the draft was read to him, Guy said, "That's what I want." Wilma was present during most of the time the will was being drafted. She assisted by paraphrasing questions Guy did not understand and by helping with the legal description of Guy's property. Although Mr. Letson never actually asked Guy if he knew of any other blood relatives besides those mentioned in the will, he testified Guy knew what he wanted to do with his property and the natural objects of his bounty were clear in his mind.

Guy's will, witnessed by Mr. Letson and his wife, left real property in Webster County, Nebraska, to Wilma Kugler Wolf and Dale Brown (Wilma's brother), share and share alike. This property was originally owned jointly by Earl Brown (Dale and Wilma's father) and Guy. The residue of his estate went to Violet Crowder, Sharon Brown, Orris Brown, Alfred Lee Brown and Floyd Brown. The will never mentioned niece Elsie Goldberg or nephews Elmer and Eugene Brown. Wilma testified Guy thought Elmer was an alcoholic and he did not want to "give him money to keep his habit up." The will stated Guy had already "dealt generously with my nephew Roy Brown . . . ." In 1972, Guy had sold Roy 400 acres of land for $16,000. The consideration was low because of Roy's blood relationship to Guy.

During the conference in which the will was prepared, at Wilma's request, Mr. Letson also drafted an "assignment" for Guy Brown. This instrument transferred to Wilma Kugler Wolf, for "one dollar . . . and other valuable consideration" various items of personal property from Guy's farm. Wilma Kugler Wolf testified this property had previously belonged to her father. At the end of the session Wilma paid Mr. Letson $35.00. Letson thought the money was payment for preparation of the will and assignment. Wilma thought it was for preparation of the assignment only.

Jerry McDole, Webster County Attorney, testified Wilma Kugler Wolf and her husband came to see him on July 16, 1976, and complained that Roy and Ella Brown were "disturbing and upsetting Guy Brown at the Sprague Nursing Home." Wilma requested McDole write a letter to Roy and Ella. He did, advising them to stop seeing Guy and if they continued "to bother and upset Mr. Brown, I will have no choice but to file charges against you for disturbing the Peace and Quiet of Mr. Brown." On July

30, 1976, Wilma brought Guy in to see Mr. McDole. As a result of that visit McDole prepared the following notice:

"*NOTICE*

"To: Harry and Regina Sprague
The Sprague Nursing Home, Red Cloud, Nebraska
and
"To Whom It May Concern:

I, Guy Brown, now residing at the Sprague Nursing Home in Red Cloud, Nebraska, do hereby state that under no circumstances will I accept as visitors the following persons:

1.  My sister-in-law, Mrs. Charley (Ella) Brown of Bellaire, Kansas.
2.  My nephew, Roy Brown, of Bellaire, Kansas.

"I further wish to state that in no event am I to be taken from the Sprague Nursing Home, either temporarily or permanently, by Ella Brown or Roy Brown.

"Signed this 30th day of July, 1976.

/s/ Guy Brown

Guy Brown

"SUBSCRIBED in my presence and sworn to before me this 30th day of July, 1976.

/s/ Jerry J. McDole

(seal)                                                                          Notary Public"

McDole testified Guy did not appear to be confused and he understood McDole's conversation with him. Wilma Kugler Wolf testified in her deposition on May 22, 1979, she never saw the notice until she went to the nursing home. Howard and Regina Sprague, however, testified Wilma brought the notice to the nursing home herself. Nothing came of the notice. Roy Brown was permitted to keep visiting Guy and no problems developed.

Guy Brown died at the Sprague Nursing Home on December 14, 1978.

The issues presented by this appeal are whether the trial court's findings that Guy Brown lacked testamentary capacity and that Wilma Kugler Wolf exerted undue influence in the preparation of his last will and testament are supported by substantial competent evidence.

The usual rules of appellate review hold true in cases involving a trial court's ruling on the issues of testamentary capacity and undue influence. In short, this court will not weigh conflicting evidence but will look only to see whether substantial competent evidence exists to support the findings of the trial court. *In re Estate of Barnes,* 218 Kan. 275, 281, 543 P.2d 1004 (1975); *In re Estate of Perkins,* 210 Kan. 619, 626, 504 P.2d 564 (1972); *In re Estate of Bernatzki,* 204 Kan. 131, 133, 460 P.2d 527 (1969); *In re Estate of Mead,* 170 Kan. 435, 438, 226 P.2d 831 (1951).

Before examining the evidence, a short review of the legal principles governing the question of testamentary capacity will be helpful. First, as long as the requisite mental capacity exists, a person's power to dispose of his property as he wishes should not be interfered with. *In re Estate of Millar,* 185 Kan. 510, 520, 345 P.2d 1033 (1959). The issue has most recently come before this court in the case of *In re Estate of Ziegelmeier,* 224 Kan. 617, 585 P.2d 974 (1978). At page 621 of that opinion the court stated:

"It is the established rule in Kansas, the deceased possesses testamentary capacity if, on the date he executes the instrument which determines the manner in which the property will be disposed after death, he knows and understands the nature and extent of that property, has an intelligent understanding concerning the disposition he desires to make of it, realizes who his relatives are and the natural objects of his bounty, and comprehends the nature of the claims of those whom he desires to include and exclude in and from participation in his worldly effects after he has no further need for them. [Citations omitted.]"

Earlier, in *In re Estate of Perkins,* 210 Kan. 619, 626-27, the court fashioned a check list of applicable rules:

"(2) In an action to avoid a will on the grounds of incapacity of the testator, when it is shown that a will has been executed in accordance with the formalities required by law, the burden is upon the will contestant and he must produce evidence to support his position. [Citation omitted.]

"(3) The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be feeble in mind and decrepit in body. [Citations omitted.]

"(4) The time when a will is made is the time of primary importance to be considered in estimating testamentary capacity. Evidence of capacity or lack of capacity before or after that time serves only as an aid to determine the primary question. [Citation omitted.]

"(5) The mere fact one is under guardianship does not necessarily deprive him of the power to make a will. [Citation omitted.]"

Further, the mere fact a person is suffering from arteriosclerosis, or its possible results, such as senile dementia, does not mean he lacks testamentary capacity. See, *e.g., In re Estate of Regle,* 170 Kan. 558, 561, 228 P.2d 722 (1951).

What is the evidence in support of the trial court's finding Guy Brown lacked testamentary capacity on February 17, 1976? As the recitation of the facts demonstrates, there is none which could be considered substantial. First, the simple fact that Guy Brown

suffered from arteriosclerosis and its typical symptoms is cited. That, of course, is not sufficient. The testimony of Terry Relihan who stated in June of 1975 Guy did not recognize him is also offered. Allene Giger testified and discussed progress reports prepared by her which indicated Guy was confused and depressed during February of 1976. He was also on medication during this period of time. Finally, there is the fact that the attorney who prepared the will never specifically asked Guy who the natural objects of his bounty were.

We find there is not substantial competent evidence to support the trial court's finding of lack of testamentary capacity. In fact the only evidence regarding Guy's capacity on the actual day the will was made tends to show he was competent. Terry Relihan's testimony referred to a time eight months prior to the preparation of the will. Allene Giger's testimony only confirmed the fact Guy was suffering from the normal symptoms of arteriosclerosis. There was no testimony the medication hindered Guy's mental processes. In fact, the Hydergine seemed to make him more alert. Finally, William Letson's failure to ask Guy about other blood relatives does not mean Guy did not know who the natural objects of his bounty were. Indeed, Mr. Letson, along with everyone else who testified regarding Guy's mental health, felt Guy had the capacity to make an intelligent decision regarding the disposition of his property.

The matter of Wilma Kugler Wolf's alleged undue influence in the preparation of Mr. Brown's will justifies our close examination. Undue influence is defined as follows:

"Generally, undue influence or fraud, to invalidate a will, must amount to coercion, compulsion or constraint which destroys the testator's free agency, and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own, and it must be brought to bear directly on the testamentary act. [Citations omitted.] Of course, the burden of proof is on the party claiming undue influence. [Citation omitted.] Legitimate influence is not improper; that is, influence obtained by kindness and affection will not be regarded as undue. [Citation omitted.]" *In re Estate of Ziegelmeier*, 224 Kan. at 622.

Where the testator has been found to lack testamentary capacity it takes much less evidence to sustain a finding of undue influence. *In re Estate of Casida*, 156 Kan. 73, 77-78, 131 P.2d 644 (1942). "[H]uman desire, motive and opportunity to exercise such influence will not alone authorize the inference that undue influence

was in fact exercised. Neither will suspicion or the possibility of their having induced the making of the will favorable to them be enough to justify a finding of undue influence." *Klose v. Collins,* 137 Kan. 321, 326, 20 P.2d 494 (1933). "A confidential relation exists whenever trust and confidence is reposed by the testator in the integrity and fidelity of another, but the existence of such relation between the testator and the favored beneficiary, standing alone, does not constitute undue influence." 94 C.J.S., Wills § 230, p. 1078. Finally, "a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that a beneficiary occupies, with respect to the testator, a confidential or fiduciary relation . . . ."Such a presumption is raised and the burden of proof shifted, however, "when, in addition to the confidential relation, there exist suspicious circumstances . . . ." 94 C.J.S., Wills § 239, pp. 1091-93.

We hold the evidence is sufficient to support the trial court's finding of undue influence on the part of Wilma Kugler Wolf. First, there existed a confidential relationship between Guy and Wilma. She was close to him in every way. She took care of Guy, helped him to obtain medical, legal and financial assistance, supervised his move to a nursing home closer to where she lived, and advised him on various personal and business matters. Second, suspicious circumstances are manifest. Wilma wrote an anonymous letter to Guy which was critical of another heir at law and then lied about it under oath. She attempted to keep others from seeing Guy and even had the county attorney prepare a notice to that effect. Finally, the events surrounding the actual execution of the will provide extra support for the trial court's finding. Wilma set up the meeting with the attorney; she assisted in the preparation of the will by paraphrasing questions to Guy and providing real estate descriptions and then remained in the room while the will was discussed; she paid for the will herself; she obtained a gift for herself of personal property by having the assignment prepared.

The trial court's decision is affirmed.