NOT DESIGNATED FOR PUBLICATION

No. 119,358

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of

LORINE H. MUELLER.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed June 21, 2019.
Affirmed.

*Michael Jilka*, of Nichols Jilka LLP, of Lawrence, for appellant Margo Loop.

*Robert J. Vincze*, of Law Offices of Robert J. Vincze, of Andover, for appellee Ryan G.
Tessendorf.

Before BUSER, P.J., POWELL, J., and STUTZMAN, S.J.

BUSER, J.:  This is a will contest appeal. Margo Loop appeals from the district court's judgment admitting the September 21, 2007 will (2007 Will) of Lorine H. Mueller. In the 2007 Will, Lorine gave most of her real estate and personal property to her daughter-in-law, Cheryl Mueller. In the district court, Lorine's son, Gary Mueller, and her daughter, Margo, contested the 2007 Will, contending that when it was executed Lorine was overcome by Cheryl's undue influence. The district court disagreed, ruling that the 2007 Will was valid and made without suspicious circumstances or undue influence. Accordingly, the 2007 Will was admitted to probate. Upon our review, we find no reversible error by the district court and, therefore, affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Except where indicated, the facts relevant to this proceeding occurred in Nebraska. Lorine Mueller died testate in Wichita, Kansas, on February 6, 2017. Lorine had been married to her husband, Casper Mueller, with whom she had three children: Randy, Gary, and Margo. Randy Mueller married Cheryl and the couple had two children.

During Lorine's lifetime, she prepared three separate wills—in 1979, 2006, and 2007. The 1979 will left all of Lorine and Casper's property in equal shares to their three children. Casper died in 1991 and Randy died in 2001. As a result, Gary, Margo, Cheryl and Cheryl's two children were Lorine's remaining heirs.

After Casper's death, Lorine lived alone for more than a decade. In 2003, she sold her home and moved into a farmhouse occupied by Cheryl and her two children. The farmhouse was owned by Mue-Cow Farms Inc., a corporation whose shares were owned by Lorine. When Lorine was hospitalized in March 2006, she executed a will which was substantially different than the 1979 one. This will provided Cheryl a portion of Lorine's estate. Also in March 2006, Lorine designated Cheryl as her attorney-in-fact under a durable power of attorney.

In 2007, Margo and Gary became concerned about Lorine's financial situation when Lorine called them asking for $108,000 to repay a loan that she could not recall obtaining. They were also concerned about Lorine's cognitive function due to various medical issues and bouts of confusion. In May 2007, Margo and Gary brought conservatorship proceedings against Lorine in which they requested that one of them be named conservator over Lorine's property.

Lorine retained the Tessendorf & Tessendorf PC law firm in July 2007 to represent her in contesting the conservatorship proceedings. Jacqueline Tessendorf, a

member of the firm, represented Lorine. During the proceedings, Lorine indicated that if a conservator was ordered, she wanted the court to appoint Cheryl as her conservator. During Jacqueline's representation, she frequently interacted with both Lorine and Cheryl. Jacqueline testified that she had no reason to believe that Cheryl had control over Lorine.

According to Jacqueline, Lorine was angry and upset that Gary and Margo brought the conservatorship proceedings. Lorine told Jacqueline that Margo and Gary rarely visited her, they did not care about her, and that she liked that Cheryl took care of her. Jacqueline emphasized that Lorine liked her living arrangements at the time. Jacqueline also testified that she had never discussed a will with either Cheryl or Lorine, but she did discuss matters relating to the durable power of attorney.

A few months later, Margo and Gary dismissed their conservatorship lawsuit after receiving results of Lorine's mini-mental status examination. The testing, conducted by Dr. Luke Lemke, found that Lorine was capable of managing her affairs and handling her activities of daily living.

Shortly after the conservatorship case was dismissed, Lorine and Cheryl met with Ryan Tessendorf, the husband of Jacqueline and member of the law firm, to discuss general estate planning matters. Ryan testified that on that occasion he did not discuss specific provisions in the will with anyone other than Lorine.

One week after the first meeting, Lorine returned alone to Ryan's office and they drafted the 2007 Will provisions in about two hours. Ryan recalled that Lorine seemed alert and "in the moment," asking and answering questions appropriately throughout their meeting. Lorine wanted to sign the 2007 Will that same day, stating that the will

3

"'accurately reflects my intentions,'" but Ryan advised her to take a couple of days to think about it. Lorine did not take a copy of the 2007 Will home with her.

When Lorine returned to Ryan's office a week later, she told Ryan that she did not want to make any changes and she signed the 2007 Will. Ryan testified that he never talked to Cheryl or any person other than Lorine about any provisions in the 2007 Will or what they may have wanted from the will.

At the time of the 2007 Will signing, Ryan testified that Lorine understood: (1) what she owned, (2) the nature and extent of her estate, (3) the natural objects of her bounty, (4) who her relatives and children were, (5) the reasonable value of the estate, and (6) who she wanted to inherit from her. Ryan testified that before Lorine signed the 2007 Will, he administered an oath to which she responded that (1) this was her last will and testament, (2) she was executing it freely and voluntarily, (3) she was over the the age of 18, (4) she was of sound mind, and (5) she was not under any undue influence or constraint. According to Ryan, Lorine did not appear to be suffering from any medical conditions at the time.

The will stated: "I consider Cheryl Mueller to be my daughter." Ryan testified that although he does not typically include such language, Lorine requested its inclusion. Under terms of the 2007 Will, Lorine devised to Cheryl: (1) all of her personal property and effects located in her home and cabin, (2) all of the farm's machinery, equipment, tools, and livestock, (3) all of Lorine's stock in Mue-Cow Inc. and real estate owned by the company, (4) the Wagner's Lake cabin, and (5) an exclusive option to purchase Lorine's real estate at a reduced price. The 2007 Will also provided that Lorine's residuary estate would be divided equally between Margo, Gary, and Cheryl.

4

Shortly after Lorine executed the 2007 Will, Jacqueline began handling legal matters for Cheryl. This representation lasted from November 2007 to 2009. Jacqueline's representation of Cheryl involved some collection and employment cases unrelated to Lorine.

Seven years later, in 2014, Margo brought another guardianship/conservatorship action against Lorine. At that time, Jacqueline represented Lorine. Margo was ultimately appointed as Lorine's guardian and conservator and she moved Lorine to Valley Center, Kansas, to live with her. Lorine spent the remainder of her life in Kansas.

In 2015, Margo filed a lawsuit on behalf of Lorine against Cheryl for breach of fiduciary duty, fraud, unjust enrichment, negligence, and conversion which occurred from 2007 to 2014. Cheryl confessed judgment, while denying wrongdoing, and entered into a settlement agreement with Margo and Lorine to reimburse Lorine about $340,000. The record on appeal does not contain much information about this litigation, but in an affidavit filed by Cheryl, she stated that she only agreed to confess judgment on the promise that the judgment amount would not be collected. The affidavit further stated that Cheryl only confessed judgment because it would benefit Lorine's tax obligations.

On February 6, 2017, Lorine died and Margo filed a petition to probate her 1979 will in Sedgwick County District Court. On March 2, 2017, Ryan, who was previously appointed the personal representative of decedent Lorine by a Nebraska court, filed a petition asking the district court to probate the 2007 Will. The district court conducted a bench trial on January 16-18, 2018, to determine whether—when Lorine made her 2007 Will—she exhibited the appropriate testamentary capacity and whether there was any undue influence involved in the execution of the 2007 Will. Although Lorine executed the 2007 Will in Nebraska where her assets were located, the district court concluded that

jurisdiction and venue were proper in Sedgwick County, Kansas, because Lorine resided there at the time of her death.

At the bench trial, Margo, Gary, Ryan, Jacqueline, and Dr. Stephen Benson testified. Cheryl's testimony was presented by deposition. After the bench trial, on April 5, 2018, the district court filed a 20-page journal entry which set forth extensive factual findings and conclusions of law.

As discussed more fully in the analysis, the district court found that in 2007 Lorine had testamentary capacity, despite being in her 80's and having indications that she exhibited mild dementia. The district court also found that Ryan had established a prima facie case that the 2007 Will was enforceable and that Margo did not challenge this prima facie case.

Next, the district court found that Cheryl was in a confidential and fiduciary relationship with Lorine. But the district court found that there were no suspicious circumstances that presented a presumption of undue influence in the preparation of the 2007 Will. Finally, the district court ruled there was no conflict of interest at the time Ryan prepared the 2007 Will and that Lorine obtained independent legal advice from Ryan regarding the will.

In summary, the district court held that Margo had failed to show coercion or constraint with regard to the 2007 Will, "such that Lorine's free agency was destroyed and that Lorine was obliged to adopt the will of another rather than exercise her own." The district court admitted the 2007 Will to probate. Margo filed a timely notice of appeal.

The first consideration in a will contest is whether the proponent of the will has made a prima facie case for its validity. As our Supreme Court has stated:

"When a will or other testamentary document is contested, the proponent has the initial burden of proving a prima facie case for its validity, which requires proof that the testator or testatrix had testamentary capacity and that the execution of the will or other testamentary document complied with the requisite statutory formalities. Once the prima facie case for validity has been made by the proponent of the document, the burden shifts to the opponent of the document to overcome the presumption of validity by clear, satisfactory, and convincing evidence." *Cresto v. Cresto*, 302 Kan. 820, Syl. ¶ 1, 358 P.3d 831 (2015).

In the present case, the district court found: "Margo did not challenge the fact that Ryan Tessendorf established a *prima facie* case of a potentially enforceable will. The 2007 Will was a self-proved will and under Nebraska law, that establishes a *prima facie* case of due execution." Margo does not contest this finding on appeal. As a result, we will not review this particular finding.

Margo's principal issue on appeal is that the district court erred in ruling that Lorine was not subject to undue influence from Cheryl at the time she executed the 2007 Will. In considering this claim by Margo, we are guided by our Supreme Court's precedent:

"One manner in which an opponent of a testamentary document can overcome the presumption of validity is to show that it was the product of undue influence, which has been defined as such coercion, compulsion, or constraint that the document maker's free agency is destroyed, and because the maker's power of resistance has been overcome, the maker is obliged to adopt the will of another rather than exercise the maker's own." *Cresto*, 302 Kan. 820, Syl. ¶ 2.

7

In evaluating this claim of error, we first note the district court's finding that "Cheryl was in a confidential and [f]iduciary relationship with Lorine." On appeal, Ryan does not contest this finding. This judicial determination is important because it requires us to evaluate the evidence by employing the suspicious circumstances doctrine. As explained by our Supreme Court:

"Because undue influence by a person in a confidential relationship with the maker of a testamentary document is often not amenable to direct proof, courts utilize the suspicious circumstances doctrine. Under the suspicious circumstances doctrine, a person contesting a testamentary document without direct evidence that it was the product of undue influence can nevertheless establish a presumption of undue influence by showing that (1) the person who is alleged to have exerted undue influence was in a confidential and fiduciary relationship with the person executing the testamentary document, and (2) there were suspicious circumstances surrounding the making of the testamentary document." *Cresto*, 302 Kan. 820, Syl. ¶ 3.

Given the undisputed finding that Cheryl was in a confidential and fiduciary relationship with Lorine, Margo's appeal focuses on the second factor of the doctrine: Were there suspicious circumstances surrounding the making of the 2007 Will? This question is one of fact. As our Supreme Court has taught: "The question of whether suspicious circumstances exist to create a presumption of undue influence in the making of a testamentary document is a question of fact to be determined on a case-by-case basis in light of the factual background presented." 302 Kan. 820, Syl. ¶ 4. If suspicious circumstances are established: "[A] presumption of undue influence is created which shifts the burden to the proponent of the document to rebut the presumption of undue influence." 302 Kan. 820, Syl. ¶ 6.

In the present case—as Margo complains of on appeal—the district court ruled that "the making of the [2007 W]ill and the dispositive provisions in the will are not suspicious under a totality of circumstances." As a consequence, the district court

8

concluded that no presumption of undue influence was established and the burden of proof did not shift to Ryan.

Finally, as both parties agree, the district court's finding that "Margo has failed to show coercion, compulsion or constraint such that Lorine's free agency was destroyed and that Lorine was obliged to adopt the will of another rather than exercise her own" is a negative finding. This negative finding establishes our court's standard of review on appeal:

> "The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Cresto*, 302 Kan. 820, Syl. ¶ 7.

Margo does not allege that the district court exhibited bias or prejudice in reaching its decision; rather, Margo contends the district court *arbitrarily disregarded undisputed evidence* that showed Cheryl's intent to manipulate Lorine into changing her will.

With these legal precepts and our standard of review in mind, we will separately consider Margo's three claims of error that support her first contention on appeal that the district court arbitrarily disregarded undisputed evidence in concluding that the making of the 2007 Will was not done under suspicious circumstances, and that Cheryl did not exert undue influence on Lorine.

9

*Margo's Claim that Cheryl Exploited Lorine's Poor Living Conditions, Declining Health, and Social Isolation to Coerce Her to Change Her Will to Favor Cheryl*

Margo asserts the district court "paid scant attention" to the evidence that Cheryl purposely isolated Lorine and "used that isolation to financially exploit an elderly and vulnerable woman." In particular, Margo focuses on Lorine's medical records which "paint a picture of a person in declining physical and cognitive health."

Although neither party contended that Lorine lacked the testamentary capacity to make the 2007 Will, her physical and mental abilities to withstand any undue influence from Cheryl were the subject of disputed evidence. The district court found that Lorine had numerous medical issues typical for an elderly person. Although Lorine exhibited some instances of confusion beginning in 1996, had mini strokes, and was diagnosed with early Alzheimer's dementia in 2006 and 2007, her medical reports also showed that Lorine was "'pleasant,' 'alert,' and 'oriented.'" The district court specifically referenced the mini-mental exam administered to Lorine in 2007, as part of the first conservatorship action, in which Lorine scored a 28 out of 30 possible points which indicated "very minimal, if any, cognitive decline."

On the other hand, Margo and Gary retained Dr. Benson to testify as an expert witness regarding Lorine's mental status and cognitive abilities. In 2014, Dr. Benson performed various neurological tests on Lorine and extensively reviewed her medical records up to that date. According to the district court, Dr. Benson opined that "Lorine was subject to undue influence by Cheryl."

The district court concluded, however:

"Dr. Benson's testimony is completely at odds with the testimony of Lorine's attorney Ryan Tessendorf, who was present at the signing of the 2007 [W]ill. Candidly the court

10

has considered the testimony of Dr. Benson and does not accept the opinion of Dr. Benson but rather accepts the testimony and opinion of Ryan Tessendorf regarding the issue of undue influence."

As an appellate court we may not second-guess the district court's assessment of a witness' testimony:  "[A] district court's ability to observe witnesses and, in this case to assess detachment, objectivity, and professionalism, is one of the reasons that appellate courts defer to the trial court's factual findings and witness credibility assessments." *Cresto*, 302 Kan. at 839.

From this record it is apparent the district court did not arbitrarily disregard uncontested evidence, but considered the highly controverted evidence regarding Lorine's physical and mental condition and her susceptibility to undue influence, and concluded that Margo had not met her burden of proof in this regard. The district court's findings of fact are supported by substantial competent evidence and we find no error in its legal conclusion.

*Margo's Claim that the District Court's Findings Blaming Margo and Gary for Failing to Remedy Lorine's Living Conditions Are Misguided*

Margo contends the district court's finding that she and Gary failed to remedy the poor living conditions in which Lorine resided was "misguided" because Cheryl isolated Lorine from them.

The district court found that Cheryl was the primary caretaker of Lorine from at least 2002 until 2014. Cheryl, her two children, and Lorine lived together in the farmhouse. When Margo and Gary visited the farmhouse in 2001 and 2005, the district court described the photographs they took as showing "clutter, filth, mouse droppings, etc." Moreover, the district court cited Margo's testimony that in 2003 Lorine was

11

depressed and noncommunicative and her teeth were black. Based on this evidence, the district court concluded that Margo and Gary should have been aware of Lorine's poor living conditions, yet prior to the 2014 guardianship and conservatorship proceeding there was "no indication that Margo or Gary offered to have Lorine come live with them."

The legal effect, if any, of these factual findings upon the district court's ultimate legal conclusions is unstated in the journal entry. While Margo argues that she and Gary's failure to remedy Lorine's living conditions was the result of Cheryl's isolation of Lorine—and there was some evidence of that—she also contends that these findings should not have influenced the district court's evaluation of whether Cheryl exercised undue influence in Lorine's preparation of the 2007 Will.

We agree with Margo that whether she and Gary failed to remedy Lorine's living conditions is not relevant or material to the legal question of whether Cheryl exercised undue influence upon Lorine during the preparation of the 2007 Will. We could speculate that the district court mentioned these factual findings to suggest that the couple's failure to remedy Lorine's living situation simply indicated that her living conditions were not as poor as argued by Margo and Gary. But the journal entry is silent regarding the legal significance of these factual findings and we are unwilling to speculate on what, if any, legal reasons the district court had for including these findings in its judgment. On this limited record, we are unable to find error in the district court's decision-making. Regardless, it is apparent that the district court took into account Lorine's poor living conditions as described and documented by Margo and Gary. As such, the district court did not arbitrarily disregard the evidence of poor living conditions.

*Margo's Claim that the District Court Arbitrarily Disregarded Evidence of Cheryl's Financial Exploitation of Lorine*

Margo contends:

"In this environment of control, isolation and squalor, Cheryl Mueller carried out her nefarious scheme to coerce Lorine to alter her will to leave Cheryl the bulk of her estate. The district court arbitrarily disregarded undisputed evidence of the financial abuse and exploitation Cheryl Mueller visited upon Lorine in the months leading up to the 2007 [W]ill."

In particular, Margo highlights evidence that Cheryl was Lorine's attorney-in-fact under a durable power of attorney and "fiercely resist[ed]" any attempt to relinquish control over Lorine's financial affairs. Margo notes that Cheryl wrote checks to herself from Lorine's account and Cheryl's father, Harry Wurth, engaged in questionable financial dealings involving Lorine. Finally, Margo points to the fact that Cheryl eventually confessed judgment in the amount of $340,846.52 to claims of a breach of fiduciary duty, fraud, unjust enrichment, negligence, and conversion which included events beginning in 2007 and continuing until 2014.

In its journal entry, the district court found that Cheryl wrote checks out of Lorine's accounts and some checks were made out to Cheryl or cash. The district court acknowledged that this was a breach of fiduciary duty and noted that Cheryl's confessed judgment included some transactions which transpired in 2007. The district court also made a factual finding that Lorine borrowed money from Cheryl's father, Harry Wurth, on at least one occasion and considered selling the farm to him to pay off the loan. Some of this money went to Cheryl.

In response to Cheryl's argument, Ryan emphasizes that the district court did not disregard any of this evidence of questionable financial dealings but, on the contrary,

13

specifically considered this evidence and referenced it in the court's findings of fact in the journal entry.

Rather than impute suspicious circumstances to the questionable financial dealings that occurred prior to and after the making of the 2007 Will, the district court focused on facts supporting the proposition that Lorine apparently had valid reasons to favor Cheryl in making the 2007 Will:

> "Cheryl was the person who took care of Lorine and advocated on Lorine's behalf. Lorine's children didn't visit or communicate with Lorine regularly. . . . Cheryl was Lorine's daughter in law, had daily contact with her and took care of her on a daily basis. Lorine lived with Cheryl and Cheryl's children at the farmhouse. Based on these facts it is not suspicious that Lorine had a new will prepared in 2007 to give more of her estate to Cheryl."

The evidence showed that Lorine told many people that she thought of Cheryl as a daughter. In this regard: "Legitimate influence is not improper; that is, influence obtained by kindness and affection will not be regarded as undue." *In re Estate of Ziegelmeier*, 224 Kan. 617, 622, 585 P.2d 974 (1978). Our review of the record confirms the long and close familial relationship between Lorine and Cheryl. Under the circumstances, it is natural that Lorine would desire to leave a substantial part of her estate to Cheryl.

The district court also noted another reason why Lorine would want to change her will in 2007 to significantly exclude Margo and Gary from Lorine's estate. As the district court observed: "Lorine had just gone through a contested legal proceeding where Margo and Gary had attempted to establish a conservatorship over Lorine's estate."

14

Our review of the record shows substantial competent evidence to support the district court's conclusion that, from Lorine's point of view, she had reasons to deprive Margo and Gary of her assets upon her death. While these reasons may or may not have been good ones, they were Lorine's reasons which were uninfluenced by Cheryl. For example, Margo and Gary's significant concerns about Lorine's health and well-being resulted in the filing of the 2007 conservatorship action. It is understandable, however, that Lorine viewed this legal action not in a caring and compassionate way. Rather, Lorine actively resisted the conservatorship proceeding, and Ryan testified that Lorine expressed her disappointment with Margo and Gary for filing it. While Lorine's displeasure at Margo and Gary's legal action may have been misguided given the couple's apparent best intentions, it is understandable under the circumstances that, promptly after the conservatorship action was dismissed, Lorine did not want to favor Margo and Gary with any significant portion of her estate.

Lorine bequeathed a substantially larger portion of her estate to Cheryl rather than her natural born children, and our Supreme Court has found that "'ordinarily it would be considered suspicious for a testator or testatrix to disinherit his or her natural born children and leave the estate to others.'" *In re Estate of Haneberg*, 270 Kan. 365, 376, 14 P.3d 1088 (2000). However, "'there are certainly factual circumstances where such a disposition would be expected and not at all suspicious.'" 270 Kan. at 376.

Because the district court was persuaded that the disputed facts weighed in favor of Lorine having facially valid reasons to make the provisions of her 2007 Will, rather than being under the undue influence of Cheryl, the district court concluded that "it is not suspicious that Lorine had a new will prepared in 2007 to give more of her estate to Cheryl. There are not suspicious circumstances in the making of the 2007 [W]ill."

15

Finally, the district court specifically referenced in its journal entry the numerous questionable financial dealings that occurred over the years involving Lorine, Cheryl, and her father. The district court obviously considered these matters but ultimately placed greater weight on the circumstances that immediately surrounded the preparation of the 2007 Will. In this regard, the district court emphasized Ryan's testimony:

"As indicated above, on the date Lorine executed the [2007 W]ill she came to the Tessendorf law firm by herself. Ryan Tessendorf observed and interacted with Lorine personally and outside the presence of any third party other than his secretary. He questioned her and received appropriate answers to his questions. Ryan Tessendorf stated that he was qualified to judge undue influence based on his education, training, and experience as that is what he does for a living. Lorine appeared to him to be competent to execute her will and not under any coercion, compulsion or constraint from any person."

The district court's focus and emphasis on the circumstances directly involving the preparation of the 2007 Will, rather than disputed financial dealings that occurred either before or after the preparation of the will, is in accord with Kansas caselaw. As our Supreme Court has stated: "[I]n order to establish undue influence, a party must show both the compulsion and a direct relationship *between the compulsion and testamentary act*. 'Undue influence, in order to vitiate the will of a decedent, *must directly affect the testamentary act itself*.' [Citations omitted.]" (Emphases added.) *Cresto*, 302 Kan. at 833.

Margo cites *In re Estate of Brown*, 230 Kan. 726, 640 P.2d 1250 (1982), in support of her contention that suspicious circumstances existed in the preparation of Lorine's 2007 Will. In *In re Estate of Brown*, the testator, Guy Brown, left a substantial amount of his estate to his niece, Wilma Wolf. Guy suffered from arteriosclerosis which included symptoms of confusion and dementia. Wilma took care of him on a daily basis and visited him frequently when he was in a nursing home. Our Supreme Court affirmed

16

the district court's judgment denying the admission of the will to probate due to suspicious circumstances. 203 Kan. at 732.

In finding that suspicious circumstances existed, the Supreme Court noted that Wilma wrote anonymous letters to Guy about the other heirs and then lied about it under oath. She attempted to keep the other heirs from seeing Guy, which included having the county attorney prepare an official notice barring them from visiting Guy at the nursing home. The Supreme Court also found the facts surrounding the actual execution of the will were suspicious. Wilma arranged the meeting with the attorney about the will, was present while Guy discussed the will's provisions, and even assisted in preparing the will by paraphrasing questions and providing real estate descriptions. Wilma paid for the attorney's legal services which included, at Wilma's request, preparation of an assignment for Guy to execute that transferred items of personal property from his farm to Wilma. 230 Kan. at 728, 732.

At the outset, *In re Estate of Brown* is readily distinguishable from the case on appeal because it involved a different standard of appellate review. In that opinion our Supreme Court found substantial competent evidence to support the district court's finding of suspicious circumstances. 230 Kan. at 732. In the case on appeal, wherein the district court found there was not sufficient proof of suspicious circumstances, our standard of review is whether the district court arbitrarily disregarded undisputed evidence. As discussed earlier, although in this appeal there were facts that may have suggested undue influence, the district court did not arbitrarily disregard them but considered them and found that they were outweighed by other evidence favoring admission of the 2007 Will to probate. Our analysis of the district court's negative finding is more restrictive than the one employed by our Supreme Court in *In re Estate of Brown*.

17

Moreover, although there are some factual similarities between *In re Estate of Brown* and the case on appeal, the circumstances associated with the actual preparation of the will are significantly different. Unlike *In re Estate of Brown*, it was Lorine's idea to modify her will, not the beneficiary's. Moreover, in contrast to *In re Estate of Brown*, Lorine consulted with Ryan alone and had independent legal advice without the beneficiary's substantial involvement in the drafting and preparation of the will documents. In sum, *In re Estate of Brown* does not provide legal support for Margo's claim that Cheryl exerted undue influence on Lorine at the time the 2007 Will was prepared.

In summary, Margo was tasked with overcoming the presumption of validity of the 2007 Will by presenting clear, satisfactory, and convincing evidence that the 2007 Will was the product of Cheryl's undue influence over Lorine. See *Cresto*, 302 Kan. 820, Syl. ¶ 1. In her first issue on appeal, Margo made three claims of error in support of her contention that the district court arbitrarily disregarded undisputed evidence in finding that, although Cheryl was in a confidential and fiduciary relationship with Lorine, the 2007 Will was not prepared under suspicious circumstances and, therefore, Cheryl did not exert undue influence on Lorine. Upon our review, we conclude that Margo has not met her heavy burden of proof to overcome the presumption of validity of the 2007 Will and, accordingly, the district court did not err in admitting it to probate.

CONFLICT OF INTEREST

For her second claim of error, Margo asserts the district court erred in finding no concurrent conflict of interest existed between the Tessendorf law firm, Lorine, and Cheryl at the time the 2007 Will was executed. In response, Ryan, who was previously appointed the personal representative of the decedent Lorine by a Nebraska court, and petitioned to probate her 2007 Will, denies there was a conflict of interest existing at the time he represented Lorine in drafting her will.

The district court concluded: "There was no conflict of interest for the Tessendorf Law Firm existing at the time Ryan Tessendor represented Lorine in drafting her [2007 W]ill. Lorine received independent legal advice from Ryan Tessendorf in the preparation and execution of her will."

In arriving at this legal conclusion, the district court highlighted numerous facts, including:

1. In 2007 Jacqueline was the wife of Ryan, and both individuals were members of the Tessendorf law firm.
2. The Tessendorfs did not represent Lorine or Cheryl prior to 2007.
3. Jacqueline represented Lorine in the 2007 conservatorship proceeding.
4. During the course of her representation of Lorine in the conservatorship proceeding, Jacqueline always met with Lorine and Cheryl together, although she did not believe that Cheryl had any control over Lorine.
5. Jacqueline never talked to Lorine or Cheryl about Lorine's will, although she did converse with them about the durable power of attorney that Lorine had given to Cheryl in 2006 and its effect on the conservatorship proceeding.
6. The conservatorship proceeding was dismissed on September 4, 2007.
7. "After the Conservatorship action was dismissed, Lorine went to Ryan Tessendorf to have him write a new will. At the time Lorine went to Ryan . . . , the Tessendorf firm was not representing Cheryl."
8. Initially, Ryan met with both Lorine and Cheryl.
9. Subsequently, Ryan met alone with Lorine on two separate occasions in September 2007 to discuss the will provisions.
10. Ryan "determined for himself that Lorine was acting on her own accord and was not under the influence of any third person."

19

11. At the time the 2007 Will was executed, Ryan asked Lorine if she was "under any undue influence or constraint today?" Lorine responded, "No."

12. Neither Cheryl nor her brother, Ray, nor the two grandchildren, nor "anyone who could be characterized as an agent of Cheryl" had any communications with Ryan about what they may have wanted included in the 2007 Will.

13. "It wasn't until after Ryan Tessendorf completed the work on Lorine's [2007 W]ill, and after the will had been signed by Lorine that Jacqueline Tessendorf began handling matters for Cheryl Mueller. The earliest matter would have been November or December of 2007 and the last matter was sometime in 2009."

Our standard of review provides: "[T]he determination of whether an attorney suffers under a conflict of interest is a question of law, while the determination of whether that conflict coupled with a confidential relationship resulted in an imposition of undue influence upon the testatrix is a question of fact." *In re Estate of Koch*, 18 Kan. App. 2d 188, 215, 849 P.2d 977 (1993). Under Kansas law, when a conflict of interest exists, a strong presumption of undue influence is created, and the burden of proof remains on the proponent of the will to overcome this presumption by clear and convincing evidence. 18 Kan. App. 2d at 216. "When determining whether a conflict of interest exists a down-to-earth, real world, functional approach should be utilized." 18 Kan. App. 2d 188, Syl. ¶ 14.

Margo focuses her argument on KRPC 1.7(a) of the Kansas Rules of Professional Conduct (KRPC) (2019 Kan. S. Ct. R. 308), which provides in pertinent part:

". . . [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or

20

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

Of note, Nebraska's Rules of Professional Conduct provide the same language as Kansas' rules regarding conflicts of interest. However, Nebraska only requires that there be a significant risk rather than a substantial one. Neb. Ct. R. of Prof. Cond. §3.-501.7(a)(1) and (2).

Although Margo does not point out which particular subsection of KRPC Rule 1.7(a) was violated in this instance, it appears that her complaint is more appropriately considered under subsection (a)(2). Margo contends that Cheryl "was just as much a client of the Tessendorf law firm as was Lorine." Because of this assertion of concurrent representation, the first question presented is whether Cheryl was, in fact, a client of the Tessendorf law firm at the time the 2007 Will was prepared and signed. The district court found there was no concurrent representation at this time. It specifically found that Lorine was a client of the firm at that time, and, although Cheryl had some interactions with the firm, she did not become a client until after Lorine's representation in the probate matter was completed. This finding is supported by substantial competent evidence.

Jacqueline represented Lorine in the conservatorship proceeding until its dismissal in 2007. Ryan then represented Lorine in this 2007 estate matter. After the 2007 Will was prepared and signed, Jacqueline represented Cheryl in unrelated employment and collections matters. Based on this evidence, there was no period of time when either Jacqueline or Ryan represented Lorine and Cheryl at the same time the 2007 Will was prepared. Quite simply, only Lorine was a client of the Tessendorf firm at the time the 2007 Will was prepared and signed; hence, there was no concurrent representation.

21

Apart from the issue of whether Lorine and Cheryl were concurrent clients, KRPC 1.7(a)(2) also applies to situations wherein there is a substantial risk that Ryan's representation of Lorine was materially limited by Ryan's responsibilities to Cheryl as "a third person." See KRPC 1.7(a)(2). While Cheryl was not a client of the Tessendorf law firm at the time of the preparation and signing of the 2007 Will, she had assisted Lorine and Jacqueline in the prior conservatorship proceeding brought by Margo and Gary. As the district court found, she also had a confidential fiduciary relationship with Lorine. Moreover, Cheryl's father had paid attorney fees to the Tessendorf law firm for its representation of Lorine in the conservatorship case and 2007 Will preparation.

At the outset, Margo does not raise or brief the applicability of, or Ryan's compliance with, KRPC 1.8(f) (2019 Kan. S. Ct. R. 315), which relates to ethical rules pertaining to when a lawyer is paid attorney fees from a source other than the client. Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williamson*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). However, the fact that Cheryl's father paid the attorney fees and Cheryl was in a confidential fiduciary relationship with Lorine necessitates a review of whether, under KRPC 1.7(a)(2) there was a substantial risk that Ryan's legal representation of Lorine in the preparation of the 2007 Will was materially limited by his responsibilities to Cheryl as a "third person."

In addressing this issue, we turn to the *In re Estate of Koch* opinion for some general guidance. In *Koch*, two of the testatrix's sons claimed there was a conflict of interest because the attorney who drafted the will also represented the will's other beneficiaries in some intra-family litigation. The litigation involved the family's company which happened to be operated by the testatrix's other two sons. The opponents claimed that the attorney, given his representation of the two beneficiaries, was materially limited as scrivener of the will, in his ability to represent the testatrix. The opponents also

claimed that the conflict of interest created suspicious circumstances that raised a presumption of undue influence.

Although *Koch* dealt with the precursor to the current KRPC 1.7, see Model Rules of Professional Conduct 1.7 (1992 Kan. Ct. R. Annot. 261), its guidance regarding the judicial evaluation of conflicts of interest in testamentary matters emphasized employing a very practical analytical approach. We noted in *Koch* that the attorney's function in preparing the will was to be the scrivener and the attorney had no contact with the testatrix's children in formulating the estate plan. The attorney prepared the will as the testatrix requested and there was no evidence that he did so with extraneous considerations of other matters involving the potential beneficiaries.

In *Koch*, our court found:

"Under the facts and circumstances of this case, a scrivener of a will who represents the testatrix's children in pending litigation, but received no input from them as to the provisions of a will in which they become beneficiaries, is not in a conflict of interest position with the testatrix under [KRPC] 1.7." 18 Kan. App. 2d 188, Syl. ¶ 15.

Our court further noted: "The scrivener's representation of clients who may become beneficiaries of a will does not by itself result in a conflict of interest in the preparation of the will." 18 Kan. App. 2d at 221.

*Koch*'s precedent is consistent with earlier Kansas caselaw. See *In re Estate of Arney*, 174 Kan. 64, 70, 254 P.2d 314 (1953) ("Situations where attorneys have prepared a will and subsequently accepted employment for the sole or principal beneficiary are legion and we are not disposed to hold that such action is improper or gives rise to either inference or presumption that the attorney was not representing the testator on the date he prepared his will."); see also *In re Estate of Guest*, 182 Kan. 760, 764, 324 P.2d 184 (1958) (holding the testator received independent advice despite the fact that the

23

scrivener was also the attorney for the father of one of the two beneficiaries because neither beneficiary had anything to do with the preparation of the will).

From *In re Estate of Koch* we discern that one important factor in identifying that a conflict of interest has occurred is when the scrivener's other client (or third person such as Cheryl), who will be a beneficiary under the will, provides input to the attorney regarding the provisions of the will. In the case on appeal, the district court found that no such input from Cheryl, her father, or any other person occurred during the preparation of the 2007 Will, and our independent review of the record confirms that finding.

Focusing our attention on the evidence presented which dealt with the preparation of the 2007 Will, we conclude there was no conflict of interest, as described in KRPC Rule 1.7(a)(2) involving the Tessendorf law firm at the time Ryan represented Lorine in drafting her 2007 Will. Moreover, the record also supports that Lorine received independent legal advice from Ryan and his preparation of the 2007 Will was in conformance with her wishes.

In conclusion, we find no error in the district court's conclusion that Margo did not meet her burden of proof to overcome the presumption of validity of the 2007 Will by her claims of undue influence. Moreover, the district court's legal conclusion was supported by substantial competent evidence.

Affirmed.